774 So.2d 119 (2000)
Phyllis Kay Roby DOERR, et al.
v.
MOBIL OIL CORPORATION, et al.
No. 00-CC-0947.
Supreme Court of Louisiana.
December 19, 2000.
*121 Alfonse Savino Monteferrante, Esq., John Wayne Mumphrey, Esq., Claude Salvador Mumphrey, II, Esq., Wayne Brown Mumphrey, Esq., Chalmette, Counsel for Applicant.
Alvin Bordelon, Jr., Esq., Manuel A. Fernandez, Esq., Gilbert Victor Andry, IV, Esq., Irving Jay Warshauer, Esq., Sidney D. Torres, III, Esq., John Gordon Gomila, Jr., Esq., Godfrey Bruce Parkerson, Esq., Kenan Slade Rand, Jr., Esq., New Orleans, Counsel for Respondent.
Celeste D. Elliott, Esq., Ralph Shelton Hubbard, III, Esq., New Orleans, John C. Yang, Esq., Laralee C. Morell, Esq., Laura A. Foggan, Esq., Washington, DC, Counsel for Alliance of American Insurers, and National Association of Independent Ins., (Amicus Curiae).
Richard Nelson Dicharry, Esq., George Bartlett Hall, Jr., Esq., Harry Alston Johnson, III, Esq., Leah Elizabeth Nunn, Esq., New Orleans, Counsel for Lloyd's *122 London Certain Underwriters, and London Market Insurance Companies, (Amicus Curiae).
CALOGERO, Chief Justice.
This class action lawsuit arises out of a discharge of hydrocarbons from a Mobil Oil refinery in Chalmette, Louisiana into the Mississippi River in January of 1998. Following the discharge, the hydrocarbons were allegedly drawn into the St. Bernard Parish water system and then distributed to users throughout the parish. The plaintiffs seek compensation from St. Bernard Parish and its insurer, Genesis Insurance Company, among others, for personal injuries allegedly suffered following the consumption and/or use of the allegedly contaminated water. The trial court denied a motion for summary judgment filed by Genesis based upon a total pollution exclusion endorsement in the policy. The Fourth Circuit Court of Appeal thereafter reversed and dismissed the claim against Genesis based on the interpretation of that exclusion by this court in its decision in Ducote v. Koch Pipeline Co., 98-0942 (La.1/20/99), 730 So.2d 432. We granted the writ application of St. Bernard Parish to reexamine our holding in Ducote and to consider its contention that the insurance policy issued by Genesis Insurance covers its potential liability exposure in this case.

Facts
The plaintiffs allege that from January 7, 1998 to January 11, 1998, the Mobil Oil Chalmette refinery, which was owned and operated by Mobil Oil Corporation and Chalmette Refining, L.L.C., "experienced discharge(s), spill(s), upset(s) and/or emission(s) of various substances, hazardous and nonhazardous, as a result of overflow or runoff of the contents of its waste water facility" into the Mississippi River. These "substances," it is alleged, were drawn into the St. Bernard Parish water system and, in turn, distributed to at least 6,000 persons within the homes and businesses of St. Bernard Parish.
Although the parties dispute the date that Genesis first began insuring the St. Bernard Parish government, the policy at issue was a commercial general liability insurance policy ("CGL policy") issued by Genesis Insurance Company to St. Bernard Parish that was effective from February 1, 1996 to February 1, 1999. Under the terms of the policy, St. Bernard Parish was self-insured against claims of up to $250,000 and Genesis provided coverage for the next $1,000,000 of liability, per occurrence, for bodily injury or property damage caused by St. Bernard Parish. Additionally, the policy contained an endorsement entitled "Total Pollution Exclusion Endorsement," which provided in its entirety:
This insurance does not apply to:
(1) "Bodily injury", "property damage", "personal injury" or "advertising injury" which would not have occurred in whole or part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of pollutants at any time.
(2) Any loss, cost or expense arising out of any:
(a) Request, demand or order that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of pollutants; or
(b) Claim or suit by or on behalf of a governmental authority or others for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of pollutants.
Pollutants means solid liquid, gaseous, or thermal irritant or contaminant including smoke, vapor, soot, fumes, acid, alkalis, chemicals and waste.
Waste includes material to be recycled, reconditioned or reclaimed.

*123 This exclusion does not apply to "bodily injury", "property damage", "personal injury" or "advertising injury" caused by heat, smoke or fumes from a hostile fire. As used in the exclusion, a hostile fire means one which becomes uncontrollable or breaks out from where it was intended to be.
This exclusion was not part of the original policy, but was adopted and placed in the policy on February 27, 1996.[1]
Following the alleged contamination of their water supply, plaintiffs filed this class action suit against Mobil Oil Corporation and Chalmette Refining, L.L.C. on January 14, 1998. On July 28, 1998, plaintiffs filed a First Supplemental and Amending Petition for Damages adding EPEC Oil Co., formerly known as Tenneco Oil Co., as a defendant because of its alleged ownership and custody of the refinery at issue.[2] A Second Supplemental and Amended Petition for Damages was filed by the plaintiffs on November 5, 1998 adding St. Bernard Parish, through the Department of Public Works, Water Division, based on its distribution of the contaminated water throughout the parish. Finally, also on November 5, 1998, the plaintiffs filed a Third Supplemental and Amending Petition adding Genesis Insurance Company as a defendant based on the commercial general liability insurance policy that Genesis issued to the Parish.
In August of 1999, Genesis filed a motion for summary judgment arguing that there was "no genuine issue of material fact that the total pollution exclusion endorsement contained in the policy of insurance issued to St. Bernard Parish Government excludes coverage for plaintiffs' alleged damages." On November 5, 1999, the trial court denied Genesis's motion for summary judgment and Genesis subsequently applied for a writ from the court of appeal. On March 3, 2000, the Fourth Circuit granted the writ application, reversed the trial court, and dismissed the claim against Genesis Insurance Company. See Doerr v. Mobil Oil Corp., 99-3131, pp. 1-3 (La.App. 4 Cir. 3/3/00), 766 So.2d 562, 562-63. Specifically, the Fourth Circuit rejected the arguments that (1) Ducote's interpretation of pollution exclusions only applied prospectively, (2) this court did not have the benefit of documentation from the Office of Louisiana Commissioner of Insurance when it decided Ducote, and (3) the court should not follow Ducote because it was improperly decided. See id. 99-3131 at 1-2, 766 So.2d at 562-63. In doing so, the Fourth Circuit found that Ducote controlled and required it to find no coverage under the policy. See id. 99-3131 at 1, 766 So.2d at 562. St. Bernard Parish applied for a writ of certiorari to this court which we granted. See Doerr v. Mobil Oil Corp., 00-0947 (La.6/16/00), 763 So.2d 611.[3]

Interpretation of the Insurance Policy
The resolution of this matter turns on the interpretation of the Genesis insurance policy's total pollution exclusion. An insurance policy is an aleatory contract subject to the same basic interpretive rules as any other contract. See La. Civ.Code art. 1912, cmt. e; Magnon v. Collins, 98-2822, p. 6 (La.7/7/99), 739 So.2d 191, 196; Peterson v. Schimek, 98-1712, p. 4 (La.3/2/99), 729 So.2d 1024, 1028; Smith v. Matthews, 611 So.2d 1377, 1379 (La.1993). *124 The interpretation of an insurance contract is nothing more than a determination of the common intent of the parties. See La. Civ.Code art. 2045; Magnon, 98-2822 at 6, 739 So.2d at 196; Ledbetter v. Concord Gen. Corp., 95-0809, p. 3 (La.1/6/96), 665 So.2d 1166, 1169. Obviously, the initial determination of the parties' intent is found in the insurance policy itself. See La. Civ.Code art. 2046. In analyzing a policy provision, the words, often being terms of art, must be given their technical meaning. See id. at art. 2047. When those technical words are unambiguous and the parties' intent is clear, the insurance contract will be enforced as written. See La. Civ.Code art. 2046; Magnon, 98-2822 at 7, 739 So.2d at 197. If, on the other hand, the contract cannot be construed simply, based on its language, because of an ambiguity, the court may look to extrinsic evidence to determine the parties' intent. See Peterson, 98-1712 at 5, 729 So.2d at 1029.
When determining whether or not a policy affords coverage for an incident, it is the burden of the insured to prove the incident falls within the policy's terms. See Barber v. Best, 394 So.2d 779, 781 (La.App. 4th Cir.1981). On the other hand, the insurer bears the burden of proving the applicability of an exclusionary clause within a policy. See Dubois v. Parish Gov't Risk Mgmt. Agency-Group Health, 95-546, p. 5 (La.App. 3 Cir. 1/24/96), 670 So.2d 258, 260; Shaw v. Fidelity & Cas. Ins. Co., 582 So.2d 919, 925 (La.App. 2nd Cir.1991); Landry v. Louisiana Hosp. Serv., Inc., 449 So.2d 584, 586 (La.App. 1st Cir.1984); Barber, 394 So.2d at 781. Importantly, when making this determination, any ambiguities within the policy must be construed in favor of the insured to effect, not deny, coverage. See Yount v. Maisano, 627 So.2d 148, 151 (La. 1993); Garcia v. St. Bernard Parish Sch. Bd., 576 So.2d 975, 976 (La.1991); Breland v. Schilling, 550 So.2d 609, 610 (La.1989); Sherwood v. Stein, 261 La. 358, 362, 259 So.2d 876, 878 (1972).
In this case, the total pollution exclusion purportedly excludes coverage for any injury that "would not have occurred in whole or part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape" of any "solid liquid, gaseous, or thermal irritant or contaminant" at any time. As written, the exclusion can be read to exclude coverage for anything from the release of chlorine gases by a conglomerate chemical plant to the release of carbon monoxide from a small business owner's delivery truck. It could be read to exclude injuries resulting from a slip and fall on an oil-slicked beach to a slip and fall on spilled gasoline at a corner service station. As pointed out in Pipefitters Welfare Educ. Fund v. Westchester Fire Ins. Co., 976 F.2d 1037, 1043 (7th Cir.1992):
Without some limiting principle, the pollution exclusion clause would ... lead to some absurd results. To take but two simple examples, reading the clause broadly would bar coverage for bodily injuries suffered by one who slips and falls on the spilled contents of a bottle of Drano, and for bodily injury caused by an allergic reaction to chlorine in a public pool. Although Drano and chlorine are both irritants or contaminants that cause, under certain conditions, bodily injury or property damage, one would not ordinarily characterize these events as pollution.
The Civil Code is clear that if a contract does not lead to absurd consequences it will be enforced as written. See La. Civ. Code art. 2046. When absurd results are possible from such a reading, however, the contract is ambiguous, and the courts must construe the provision in a manner consistent with the "nature of the contract, equity, usages, the conduct of the parties before and after the formation of the contract, and of other contracts of a like nature between the same parties." La. Civ. Code art. 2053; accord La.Rev.Stat. 22:654. Finally, as pointed out above, insurance policies are construed to effect, *125 not deny, coverage, and any ambiguity should be interpreted in favor of the insured. See Yount, 627 So.2d at 151; Garcia, 576 So.2d at 976; Breland, 550 So.2d at 610; Sherwood, 261 La. at 362, 259 So.2d at 878. In this case, a literal reading of the total pollution exclusion would lead to the absurd results mentioned hereinabove. We must therefore attempt to determine the true meaning and interpretation of this pollution exclusion. We squarely addressed this question in Ducote.

Ducote v. Koch Pipeline Co.

In Ducote, Ramona Ducote and her husband sued Koch Industries, Inc., parent company of Gulf Central Pipeline Company, for injuries received when Ramona Ducote was exposed to anhydrous ammonia. See Ducote v. Koch Pipeline Co., 98-0942, pp. 1-2 (La.1/20/99), 730 So.2d 432, 434-35. Alexander & Ainsworth Contractors were subcontracted to cut the grass along an ammonia transmission line owned and operated by Gulf Central in Avoyelles Parish. See id. 98-0942 at 1, 730 So.2d at 434. Alexander & Ainsworth was insured by First Financial Indemnity Company, and Gulf Central was insured by Commercial Union Insurance Company. See id.
On September 11, 1995, an employee of Alexander & Ainsworth was cutting the grass along the Koch pipeline when his tractor overturned and the blade of the bushhog struck the pipeline, rupturing it. See id. 98-0942 at 2, 730 So.2d at 435. Ramona Ducote sued Koch Pipeline for injures allegedly sustained because of the release of the anhydrous ammonia. In response to Ducote's claim, Koch filed third party demands against Alexander & Ainsworth, First Financial, Commercial Union, and various other entities. First Financial and Commercial Union filed motions for summary judgment seeking to deny coverage based on pollution exclusion clauses in each of their policies. The clauses in Ducote were identical to the exclusion in this case in every respect except for an inconsequential difference in this case, i.e., the final paragraph of the exclusion in this case (the hostile fire exception) was not present in the Ducote exclusions.
This court, in a 4-3 decision, held that the pollution exclusions prevented the Ducotes from recovering from the insurers under their CGL policies. See id. 98-0942 at 5, 730 So.2d at 437. Specifically, the majority reasoned that the language in the first paragraph of the exclusion was unambiguous in its exclusion of any damages or injury and that this preclusion of coverage was explicit. See id. 98-0942 at 4, 730 So.2d at 436. Further, the majority found that nothing in the exclusion limited its applicability to "active industrial polluters or businesses which knowingly emit pollutants over a period of time." Id. Finally, the majority found that the exclusion "applies regardless of whether the release was intentional or accidental, a one-time event or part of an on-going pattern of pollution." Id. 98-0942 at 4-5, 730 So.2d at 437. Therefore, this court found that the pollution exclusion in the insurance policy precluded coverage for the plaintiffs' claims.[4]

Ducote's Application to this Case
As it would not be necessary to reexamine the holding in Ducote if that case did not control the one before us, we must first address the argument by St. Bernard Parish that Ducote is distinguishable. Both in brief and oral argument, the Parish argued that Ducote did not control the present matter because in Ducote an insured's own employee caused the "pollution," whereas in this case a third party *126 (the refinery) caused the "pollution." We do not agree.
The Ducote court found that pollution exclusions were unambiguous and excluded coverage for injury "which would not have occurred in whole or in part but for the [dispersal] of pollutants at any time." Ducote, 98-0942 at 2, 4, 730 So.2d at 432, 437. Therefore, if Ducote is correct, it is irrelevant who precipitates the alleged pollution event. Coverage for any injuries that "would not have occurred but for the [dispersal] of pollutants" would be excluded.
Finding that Ducote would be dispositive in this case, we turn now to the validity of that ruling and whether that decision should be overruled at this time. We therefore begin with an analysis of the origin of the pollution exclusion itself.

Origin of the Total Pollution Exclusion
As the environmental movement gained momentum in the 1970s, the insurance industry began to offer separate Environmental Impairment Liability policies to cover pollution risks. See Frank P. Grad, Treatise on Environmental Law, § 4A.02[5][d] (Matthew Bender 1998) (quoting United States General Accounting Office, Hazardous Waste, Issues Surrounding Insurance Availability, Report to Congress October 1987 (GOA/RCED-88-2), at 12)). In doing so, insurers attempted to shift coverage of environmental risks away from commercial general liability policies by introducing what has come to be known as the original general pollution exclusion. That provision excluded coverage for:
Bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water.
9 Lee R. Russ, Couch on Insurance § 127:6 (3rd ed.1997). Over time, many policies began to include a "sudden and accidental" exception to this pollution exclusion: "This exclusion does not apply if such discharge, dispersal, release or escape is sudden or accidental." See id. at § 127:8.
By the late 1970s and early 1980s, Congress had enacted new legislation that sought to protect the environment in many ways. See id. at § 127:3. The most significant piece of legislation in this regard was the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA). See 42 U.S.C. § 9601 et seq.[5] CERCLA was designed to allow the government and private individuals or entities to act as quasi-regulators over environmental pollution by allowing them to carry out the cleanup of hazardous waste sites and then recover the expenses of the cleanup from the responsible parties. See 61C Am.Jur.2d Pollution Control § 1270 (1999). Thus, two of the main purposes of CERCLA were "prompt cleanup of hazardous waste sites and imposition of all cleanup costs on the responsible party." Key Tronic Corp. v. United States, 511 U.S. 809, 815 n. 6, 114 S.Ct. 1960, 128 L.Ed.2d 797 (1994) (quoting General Elec. Co. v. Litton Indus. Automation Sys., Inc., 920 F.2d 1415, 1422 (8th Cir. 1990)). As this legislation was enforced, considerable litigation ensued over the possible existence of coverage under the standard CGL policy and, more particularly, over the meaning of the "sudden and accidental" exception to the general pollution exclusion then en vogue. See Russ, supra, at § 127:3. As this litigation expanded, insurers responded with the "absolute" pollution exclusion.
By 1986, the "absolute" pollution exclusion had been introduced which omitted from the exclusion the "sudden or accidental" *127 exception. See Grad, supra, at § 4A.02[5][e].[6] Throughout its development, the general purpose of these pollution exclusions has remained constant: "to exclude coverage for environmental pollution, and under such interpretation, [the] clause will not be applied to all contact with substances that may be classified as pollutants." Russ, supra, at § 127:6 n. 62 (citing Stoney Run Co. v. Prudential-LMI Comm. Ins. Co., 47 F.3d 34, 37 (2nd Cir. 1995)). In fact, some jurisdictions now require the inclusion of the exclusion because the exclusion serves the purpose of:
[S]trengthen[ing] environmental protection standards by imposing the full risk of loss due to personal injury or property damage from pollution upon the polluter by eliminating the option of spreading that risk through insurance coverage.
Id. at § 127:6. Importantly, there is no history in the development of this exclusion to suggest that it was ever intended to apply to anyone other than an active polluter of the environment. Consequently, the intent of this pollution exclusion was not to apply unambiguously "regardless [as the majority stated in Ducote] of whether the release was intentional or accidental, a one-time event or part of an on-going pattern of pollution." Ducote, 98-0942 at 4-5, 730 So.2d at 437. In fact, to give the pollution exclusion the broad reading found in Ducote would contravene the very purpose of a CGL policy, without regard to the realities which precipitated the need for the pollution exclusionthe federal government's war on active polluters.
Commercial General Liability policies are purchased by both large and small business owners in an attempt to protect against losses that may result from unforeseen liability-imposing events or circumstances. As stated in Section I(A)(1)(a) of the policy at issue here, the issuer of a liability policy "will pay those sums that the insured becomes legally obligated to pay as damages because of `bodily injury' or `property damage' to which this insurance applies." Business owners rely on these policies to protect them against claims and losses which might otherwise force insolvency or prompt serious losses.[7] The insurance company, on the other hand, agrees to absorb liability to which the business might otherwise be exposed in return for a premium which, along with the premiums of other insureds, is designed to adequately spread potential losses among all of the insurer's clients. These businesses come to rely on the liability policies because, without them, a single large claim might force insolvency or an intolerable monetary loss. Consequently, business owners expect that any exclusions within their policy will be read reasonably and with due regard to the intent of the policy as a whole. Giving these pollution exclusions a strictly literal reading without regard to the limited purpose behind their post-CERCLA formation would thwart the very purpose of the comprehensive general liability policy.
Both liability insurers and their insureds have certain expectations regarding issuance of a CGL policy. The liability insurer expects premiums in exchange for a certain level of risk, and the insureds expect to be insulated generally from liability claims. A literal reading of the total pollution exclusions would alter the general scope and expectation of the parties. Consequently, because the pollution exclusion was designed to exclude coverage for environmental pollution only, it should be interpreted so that the clause "will not be applied to all contact with substances that *128 may be classified as pollutants." Russ, supra, at § 127:6 n. 62 (citing Stoney Run Co. v. Prudential-LMI Comm. Ins. Co., 47 F.3d 34, 37 (2nd Cir.1995)). As Ducote conflicts with the intent of the policy exclusion and disrupts the expectations of both insurers and insureds, that opinion will be overruled at this time.
We have been urged in brief (by the Amicus Insurance Environmental Litigation Association) to avoid the result this majority effects today based on jurisprudence constante. In fact, during oral argument, counsel for Genesis read from an expression of a former justice of this court who warned of the "confusion and turmoil" that may result from this court overruling a prior case. Counsel went so far as to argue that if Ducote were reversed, incredible uncertainty would result because of this court's failure to follow its own precedent. That statement ignores the fundamental difference between a common law judiciary's adhering to stare decisis and our courts' following the civilian principle of jurisprudence constante.[8]

Jurisprudence Constante
The Civil Code establishes only two sources of law in Louisiana: legislation and custom. See La. Civ.Code art. 1. Within these two categories, legislation is superior to custom and will supercede it in every instance. See La. Civ.Code art. 3. Judicial decisions, on the other hand, are not intended to be an authoritative source of law in Louisiana. See A.N. Yiannopoulos, Louisiana Civil Law System § 35, p. 53 (1977). Consequently, Louisiana courts have frequently noted that our civilian tradition does not recognize the doctrine of stare decisis in our state. See Ardoin v. Hartford Acc't & Indem. Co., 360 So.2d 1331, 1334 (La.1978); Gulf Oil Corp. v. State Mineral Bd., 317 So.2d 576, 591 (La. 1975); Carter v. Moore, 258 La. 921, 959, 248 So.2d 813, 829 (1971); Johnson v. St. Paul Mercury Ins. Co., 256 La. 289, 296, 236 So.2d 216, 218 (1970), overruled on other grounds, Jagers v. Royal Indem. Co., 276 So.2d 309, 312 (La.1973); City of New Orleans v. Treen, 421 So.2d 282, 285 (La. App. 4th Cir.1982); State v. Placid Oil Co., 274 So.2d 402, 414 (La.App. 1st Cir.1972).
Instead, a long line of cases following the same reasoning within this state forms jurisprudence constante. See Heinick v. Jefferson Par. Sch. Bd., 97-579, p. 4 (La.App. 5 Cir. 10/28/97), 701 So.2d 1047, 1050; City of New Orleans, 421 So.2d at 285. As summarized by this court in Johnson:
Fundamental and elementary principles recognize that certainty and constancy of the law are indispensable to orderly social intercourse, a sound economic climate and a stable government. Certainty is a supreme value in the civil law system to which we are heirs. In Louisiana, courts are not bound by the doctrine of stare decisis, but there is a recognition in this State of the doctrine of jurisprudence constante. Unlike stare decisis, this latter doctrine does not contemplate adherence to a principle of law announced and applied on a single occasion in the past.
Johnson, 256 La. at 296, 236 So.2d at 218. Under the civilian tradition, while a single decision is not binding on our courts, when a series of decisions form a "constant stream of uniform and homogenous rulings having the same reasoning," jurisprudence constante applies and operates with "considerable persuasive authority." James L. Dennis, Interpretation and Application of the Civil Code and the Evaluation of Judicial Precedent, 54 La. L.Rev. 1, 15 (1993). Because of the fact that "one of the fundamental rules of [the civil law tradition] is that a tribunal is never bound by the decisions which it formerly rendered: it can always change its mind," 1 Marcel Planiol, Treatise on the Civil Law § 123, (La. *129 State Law Inst. trans.1959) (12th ed.1939), prior holdings by this court are persuasive, not authoritative, expressions of the law. See Yiannopoulos, supra, at § 35, p. 54.[9] Thus, it is only when courts consistently recognize a long-standing rule of law outside of legislative expression that the rule of law will become part of Louisiana's custom under Civil Code article 3 and be enforced as the law of the state. See La. Civ.Code art. 3.
In sum, the chief distinction between jurisprudence constante and stare decisis is this: "A single case affords sufficient foundation for the latter, while a series of adjudicated cases, all in accord, form the basis for the former." Yiannopoulos, supra, at § 35, p. 55. With these principles in mind, a survey of Louisiana's jurisprudence on this issue finds that Ducote, an opinion less than two years old, was the only decision in a nineteen-year history of jurisprudence in this state to require such a strict reading of the pollution exclusion.[10] Although our holding today does not bless the precise reasoning of all of those prior opinions, an examination of those cases does indicate that, if anything, jurisprudence constante supports the overruling of Ducote in this case.

History of Pollution Exclusions in Louisiana Courts
The litigation involving pollution exclusions has been relatively frequent over the years in Louisiana. The first Louisiana court to address the applicability of the exclusion was Connor v. Farmer, 382 So.2d 1069, 1070 (La.App. 4th Cir.1980). In Connor, the plaintiff was diagnosed with silicosis following years of exposure to sandblasting materials while on the job, and he subsequently sued his former employers' executive officers as well as their insurers. See id. at 1069. Within the insurance policy at issue in the case was a pollution exclusion clause similar to the one in this case, but the court found that the exclusion did not apply because the injury resulted from the failure to give proper equipment to Mr. Conner, not because of the discharge or escape of pollutants. See id. at 1069-70. More specifically, the court reasoned that the exclusion would be inapplicable "when the pollution is only one of two or more liability-imposing circumstances out of which the injury arises." See id. at 1070.
Similarly, five years later, the same court reversed a trial court's grant of summary judgment based on the pollution exclusion because a genuine issue of material fact remained as to whether the exclusion applied to the facts of the case. See Sellers v. Seligman, 463 So.2d 697, 702 (La. App. 4th Cir.1985). In doing so, the court rejected the literal reading of the pollution exclusion argued for by the insurance company and found:
[T]he question of whether the instant situation falls within the language of the pollution exclusion is primarily a factual issue; i.e., did the [silica dust] plaintiff inhaled constitute "irritants, contaminants, or pollutants" which were "discharged, dispersed, or escaped" into or upon "land" or "the atmosphere" within the meaning of the policy?
In Thompson v. Temple, 580 So.2d 1133 (La.App. 4th Cir.1991), the court of appeal established the first true "test" in Louisiana to determine whether or not a pollution exclusion would prevent coverage to an insured. In Thompson, the plaintiffs were overcome one evening by carbon monoxide leaking from a bathroom heater in the home they rented from Katie Temple. *130 See id. at 1134. Plaintiffs filed suit against Temple and her homeowner's insurance carrier, Allstate Insurance Company. See id. Allstate moved for summary judgment based on a pollution exclusion within the policy similar to the one in this case. See id. After the trial court granted the motion for summary judgment, the Fourth Circuit reversed and found that the exclusion did not apply to the facts of the case. See id. at 1134. More specifically, the court enunciated a test by reasoning that "[p]ollution exclusions are intended to exclude coverage for active industrial polluters, when businesses knowingly emitted pollutants over extended periods of time." Id. at 1134. As the homeowner in this case was surely not an "active polluter," the court found that the pollution exclusion was inapplicable. See id.
Later that year, the Fourth Circuit expanded on the test in West v. Board of Commissioners, 591 So.2d 1358 (La.App. 4th Cir.1991), in a case involving an investigator who sustained injury because of inhaling chemicals during an investigation into damaged containers of pesticide at his work. The plaintiffs employer was a warehousing company which had agreed to warehouse a pesticide even though some of the storage containers had earlier been damaged. See id. at 1359-60. The Fourth Circuit reasoned that when an insured only incidentally possesses a pollutant in the course of other business, the exclusion does not apply. See id. at 1360. Consequently, the court found that only when the insured is actually a "polluter" would the exclusion apply. See id. at 1361. The court remanded the case to the district court for a determination of that issue of fact. See id.
Similarly, this reasoning was followed in Crabtree v. Hayes-Dockside, Inc., 612 So.2d 249, 252-53 (La.App. 4th Cir.1992), where the defendant was found to be a "polluter" within the meaning of the policy because of his routine and regular transportation of polyvinyl chloridethe substance which caused the damage in the case. Finally, the Third Circuit adopted this reasoning and held that the pollution exclusion could only be enforced if an insured was an active industrial polluter who knowingly emitted pollutants over a period of time. See Avery v. Commercial U. Ins. Co., 621 So.2d 184, 190 (La.App. 3rd Cir. 1993).
Following Avery, this court gave its first interpretation of the application and meaning of the pollution exclusion in Louisiana. In South Central Bell Telephone Co. v. Ka-Jon Food Stores, Inc., 93-2926, p. 1 (La.5/24/94), 644 So.2d 357, 357, vacated on other grounds, (La.9/15/94), 644 So.2d 368, an underground gas tank at the Ka-Jon convenience store leaked and caused damage to subsurface telephone cables owned by South Central Bell.[11] State Farm Insurance Company had initially issued a standard CGL policy to Ka-Jon with a standard pollution exclusion. See id. 93-2926 at 2, 644 So.2d at 358. When the policy was reissued in 1986, the policy contained an "Absolute Pollution Exclusion." See id. Relying on this provision, State Farm filed a motion for summary judgment. See id. The trial court followed the decision in West and found that Ka-Jon was not an active industrial polluter. See id. 93-2926 at 3, 644 So.2d at 358. Therefore, the motion was denied. See id. The First Circuit Court of Appeal expressly disagreed with West and found that the pollution exclusion clause "clearly and unambiguously" excluded coverage in the case. See id. This court granted a writ to resolve the conflict. See id. 93-2926 at 4, 644 So.2d at 358-59.
After documenting the history of pollution exclusions, this court, in Ka-Jon, found that the exclusion in the case was ambiguous as a matter of law because a literal reading of the exclusion could lead *131 to absurd consequences. See id. 93-2926 at 11, 644 So.2d at 364. The court found that the intent of the policy was "to insure Ka-Jon against fortuitous accidents and incidental business risks of running its convenience store." See id. 93-2926 at 13, 644 So.2d at 365. The court held that the pollution exclusion would preclude coverage for: "(1) all damages or losses resulting from intentional acts of pollution or pollution causing activities, including remedial damages for environmental cleanup operations, and (2) environmental damages resulting from fortuitous pollution occurrences, including remedial damages for environmental cleanup operations." Id. 93-2926 at 12-13, 644 So.2d at 364. Finally, the court distinguished intentional acts of pollution from fortuitous acts and found that coverage for fortuitous acts of pollution was only excluded as they might pertain to environmental damage, not to other types of damage. See id. 93-2926 at 13-14, 644 So.2d at 365. Therefore, the court found that, because the gasoline leak was a fortuitous pollution event, coverage would be excluded only as it might pertain to environmental damage and was not excluded as it may pertain to other damage claims, such as damage to South Central Bell's telephone cables. See id. 93-2926 at 15, 644 So.2d at 366. As a result, the court found summary judgment to be inappropriate in the case.[12]
After rendition of the original opinion, State Farm applied for a rehearing arguing several matters. Following our grant of the rehearing application, but prior to oral argument, State Farm filed a "Motion to Vacate and Remand" asserting that the pollution exclusion interpreted in the original opinion may not have been part of the actual policy issued by State Farm to Ka-Jon. See id. 93-2926 at 2, 644 So.2d at 369 (on rehearing). Four months after rendering our original opinion, we vacated all prior judgments and remanded the matter to the district court to determine whether the pollution exclusion interpreted by the court was actually part of the policy. See id.[13]
Despite the fact that Ka-Jon was vacated, its reasoning was adopted by several Louisiana courts following its release.[14] For instance, in Sandbom v. BASF Wyandotte, Corp., 95-335, pp. 21-22 (La.App. 1 Cir. 4/30/96), 674 So.2d 349, 363-64, the First Circuit cited Ka-Jon and found that *132 the exclusion was inapplicable to the case where a plaintiff had entered a storage tank containing pollutants because no actual discharge, dispersion, or release of chemicals had taken place. Similarly, in Hinds v. Clean Land Air Water Corp., 96-1058, p. 7 (La.App. 3 Cir. 4/30/97), 693 So.2d 321, 325, the court relied on Ka-Jon's reasoning and found that an insured who placed waste in contaminant ponds had "released" or "discharged" pollutants within the meaning of the policy. Consequently, the Hinds court denied coverage for the incident. See id. 96-1058 at 10, 693 So.2d at 326. With these precedents in the jurisprudence, the issue was brought before this court for a second time in Ducote v. Koch Pipeline Co., 98-0942 (La.1/20/99), 730 So.2d 432.
As pointed out above, Ducote departed from this line of jurisprudence and found that the exclusion was unambiguous and would apply "regardless of whether the release was intentional or accidental, a one-time event or part of an on-going pattern of pollution." Id. 98-0942 at 4-5, 730 So.2d at 437.[15] In dissent from Ducote, the author of this opinion cited this court's prior holding in Ka-Jon and reasoned that although that holding was ultimately vacated because of a question as to whether the total pollution exclusion considered on original hearing was part of the insurance policy in the case, the reasoning of the opinion should remain persuasive to the Ducote court. See Ducote, 98-0942 at 1, 730 So.2d at 437-38 (Calogero, C.J., dissenting). In Ka-Jon, this author noted, this court interpreted a similar exclusion to be inapplicable to fortuitous occurrences because the parties never intended a "literal and limitless" interpretation of the policy, for such would lead to absurd consequences. See id. In conclusion, this author found in his dissent that because the injuries in Ducote stemmed from a fortuitous grass cutting accident, the exclusion could not operate to exclude coverage. See id.
In her dissent in Ducote, Justice Kimball also concluded that the pollution exclusion clause was inapplicable under the facts of the case. See id. 98-0942 at 1, 730 So.2d at 438 (Kimball, J., dissenting). First, she found that the pollution exclusion was ambiguous, and therefore the policy should be read to effectuate, not deny, coverage. See id. 98-0942 at 3, 730 So.2d at 439 (Kimball, J., dissenting). Second, because a policy cannot be read in a manner so as to bring about absurd consequences, she reasoned that coverage should be found applicable. See id. 98-0942 at 4-5, 730 So.2d at 440 (Kimball, J., dissenting). Finally, Justice Kimball documented the history of the exclusion and pointed out that it was originally designed to exclude from coverage only that property and personal damage which resulted from traditional forms of pollution. See id. 98-0942 at 6, 730 So.2d at 441 (Kimball, J., dissenting). Consequently, Justice Kimball would have found that the exclusion did not preclude coverage to the claims of the Ducotes.
In light of the fact that Ducote represented a significant departure from the interpretation of pollution exclusion clauses in Louisiana, and, more importantly, because Ducote runs counter to the true intent of the exclusion, we overrule it at this time.

Position of Louisiana Commissioner of Insurance
We believe that a full discussion of the issue in this case would be wanting without *133 discussing the position of the Louisiana Commissioner of Insurance on this issue. No insurance policy is permitted to be issued in this state without the prior approval of its provisions by the Louisiana Commissioner of Insurance. See La.Rev.Stat. 22:620(A)(1). In reviewing proposed policies, the Commissioner is required to disapprove any policy that "contains or incorporates by reference any inconsistent, ambiguous, or misleading clauses, or exceptions and conditions which unreasonably or deceptively affect the risk purported to be assumed in the general coverage of the contract." Id. at 22:621(3). Further, the Commissioner approves standard form policies which serve as a bare minimum of the rights which must be afforded an insured. See id. at 22:623. The Commissioner is permitted to approve policies which are more favorable to the insured, but prohibited by law from approving policies which are less favorable. See id. 22:623. It is undisputed by the parties that the pollution exclusion in this case was approved by the Commissioner; however, comprehension of the meaning of the clause by the Department of Insurance is particularly relevant here.
Following a three-year review of pollution exclusions in various comprehensive general liability policies, in 1997 (prior to Ducote), the Louisiana Department of Insurance issued an advisory letter designed to guide insurers in their application of the exclusions. See James H. Brown, Louisiana Commissioner of Insurance, Advisory Letter 97-01, p. 1 (June 4, 1997). The Commissioner noted:
Our review shows that standard pollution exclusions have been included in an extremely wide variety of policy forms. These exclusions are inappropriate for many types of coverage and/or for certain classes within particular coverage lines. Many insureds do not present a pollution risk obviating the need for the broad exclusionary language found in standard pollution exclusions.
Further; our review has disclosed a number of incidents where the standard pollution exclusions have been used to disavow coverage even though there was no underlying pollution incident which would justify use of the exclusion. We are also concerned that the broad definition given to the term "pollutant" creates an opportunity for abuse. This is a particular concern as regards commercial enterprises whose ongoing business activities do not present a risk to the environment. For example, we have found instances where it has been argued that any thing and/or matter that harms a person, whether or not it has toxic or hazardous properties, is de facto an irritant and therefore a pollutant, thereby triggering the pollution exclusion.
The appropriate use of standard pollution exclusions in claims handling is an issue of grave concern. The [Louisiana Department of Insurance] will take such action as is necessary to assure that the integrity of the regulatory process is not undermined. It is of critical importance that such exclusions are used in a manner which is consistent with their stated purpose.
Id. at 1-2 (footnotes omitted). The letter continued by advising insurers that (1) new pollution exclusions should be drafted to address "pollution risks actually posed" and (2) there must be "a reasonable basis for the application of the policy's pollution exclusion." Id. at 3.
Following our decision in Ducote, several insurers questioned whether the Department of Insurance had changed its position on the application of pollution exclusions:
The answer to that question is "no". To the contrary, the court's refusal to consider the regulatory history in rendering its decision has reinforced this agency's position. This is particularly true as regards the blanket utilization of standard pollution exclusions in policy forms. Further, nothing in the Ducote decision affects this agency's regulatory authority *134 under the Insurance Code. Unlike the court, this agency has considered the regulatory records and the historical purpose of the total and absolute pollution exclusions. That record shows that these exclusions were meant to exclude coverage for "RCRA" regulated activities for a limited class of insured. They are not chemical products exclusions. They were not meant to exclude coverage for routine accidents which incidentally involved a chemical agent such as was the case in Ducote.

James H. Brown, Louisiana Commissioner of Insurance, Preface to Advisory Letter 97-01, p. 1 (September 1999).[16] The Office of the Commissioner of Insurance is a constitutionally-created office, and the elected official holding that office is charged with the administration of the Insurance Code and the protection of the public interest in the realm of insurance. See La. Const. Art. IV § 11; La.Rev.Stat. 22:2. Because of the Commissioner's role in the regulation of Louisiana Insurance law, his opinion regarding matters within his province is persuasive. However, it is the job of the courts to resolve disputes over insurance coverage. See La. Const. Art. V, § 1 ("The judicial power is vested in a supreme court, courts of appeal, district courts, and other courts authorized by this Article.").
With the history and intent of the pollution exclusion in mind, we will now address the proper interpretation of these pollution exclusions under Louisiana law.

Proper Interpretation of the Total Pollution Exclusion
Ducote held that a pollution exclusion "applies regardless of whether *135 the release was intentional or accidental, a one-time event or part of an on-going pattern of pollution." Ducote, 98-0942 at 4, 730 So.2d at 437. Further, the case specifically rejected the premise that a distinction should exist between active polluters and other policy holders. See id. In light of the origin of pollution exclusions, as well as the ambiguous nature and absurd consequences which attend a strict reading of these provisions, we now find that the total pollution exclusion was neither designed nor intended to be read strictly to exclude coverage for all interactions with irritants or contaminants of any kind. Instead, we find that "[i]t is appropriate to construe [a] pollution exclusion clause in light of its general purpose, which is to exclude coverage for environmental pollution, and under such interpretation, [the] clause will not be applied to all contact with substances that may be classified as pollutants." Russ, supra, at § 127:6 n. 62. The applicability of a total pollution exclusion in any given case must necessarily turn on several considerations:
(1) Whether the insured is a "polluter" within the meaning of the exclusion;
(2) Whether the injury-causing substance is a "pollutant" within the meaning of the exclusion; and
(3) Whether there was a "discharge, dispersal, seepage, migration, release or escape" of a pollutant by the insured within the meaning of the policy.
First, the determination of whether an insured is a "polluter" is a fact-based conclusion that should encompass consideration of a wide variety of factors. In making this determination, the trier of fact should consider the nature of the insured's business, whether that type of business presents a risk of pollution, whether the insured has a separate policy covering the disputed claim, whether the insured should have known from a read of the exclusion that a separate policy covering pollution damages would be necessary for the insured's business, who the insurer typically insures, any other claims made under the policy, and any other factor the trier of fact deems relevant to this conclusion.[17]
Second, the determination of whether the injury-causing substance is a "pollutant" is also a fact-based conclusion that should encompass a wide variety of factors. As pointed out above, there are a variety of substances that could fall within the broad definition of irritants and contaminants as provided in this policy. For example, under pollution exclusions similar to the one at issue here, courts have found "pollutant" to include everything from asbestos, carbon monoxide, gasoline, lead paint, and some pesticides; on the other hand, some courts have found that "pollutants" do not include muriatic acid, styrene resins, and other forms of pesticide. See Russ, supra, at § 127:12 (collecting authorities). Consequently, when making this determination, the trier of fact should consider the nature of the injury-causing substance, its typical usage, the quantity of the discharge, whether the substance was being used for its intended purpose when the injury took place, whether the substance is one that would be viewed as a pollutant as the term is generally understood, and any other factor the trier of fact deems relevant to that conclusion.
Finally, the determination of whether there was "discharge, dispersal, seepage, migration, release or escape" is likewise a fact-based conclusion that must result after a consideration of all relevant *136 circumstances.[18] Specifically, the trier of fact should consider whether the pollutant was intentionally or negligently discharged, the amount of the injury-causing substance discharged, whether the actions of the alleged polluter were active or passive, and any other factor the trier of fact deems relevant. These factual conclusions should be made to assist a court in determining whether the total pollution exclusion in any particular case will exclude coverage for a claim.[19]
Turning to the court of appeal's ruling in this case on the motion for summary judgment filed by Genesis Insurance Co., we reverse the court of appeal, deny the motion, and remand the case to the district court.

Genesis's Motion for Summary Judgment
The Louisiana Code of Civil Procedure clearly provides that a motion for summary judgment shall be rendered if (1) there is no genuine issue of material fact in dispute and (2) the mover is entitled to judgment as a matter of law. See La.Code Civ. Pro. art. 966(B). Further, the mover has the burden of proving entitlement to summary judgment. See Hardy v. Bowie, 98-2821, p. 5 (La.9/8/99), 744 So.2d 606, 610. As an appellate court, we perform a de novo review of summary judgment rulings. See Smith v. Our Lady of the Lake Hosp., Inc., 93-2512, p. 26 (La.7/5/94), 639 So.2d 730, 750. Under the record before us, Genesis has failed to meet its burden of proving that there are no genuine issues of material fact as to whether St. Bernard Parish is a "polluter," if the hydrocarbons were "pollutants," or that there was a "discharge, dispersal, seepage, migration, release or escape" of the hydrocarbons in this case. Therefore, Genesis Insurance Company's motion for summary judgment will be denied.

Conclusion
In conclusion, Ducote is overruled, and we find that the proper interpretation of the total pollution exclusion in this case is that the exclusion was designed to exclude coverage for environmental pollution only and not for all interactions with irritants or contaminants of any kind. Accordingly, in determinating whether coverage for this incident is excluded by the total pollution exclusion, the district court should consider whether (1) St. Bernard Parish was a "polluter," (2) the hydrocarbons in the allegedly contaminated water were "pollutants," and (3) the distribution of the water through St. Bernard Parish's water system was a "discharge, dispersal, seepage, migration, release or escape," all within the meaning of the policy and its exclusion.

DECREE
For the foregoing reasons, the decision of the court of appeal is reversed and the district court's ruling reinstated, denying Genesis Insurance Company's Motion for Summary Judgment. The case is remanded to the district court for further proceedings consistent with this opinion.
REVERSED; MOTION FOR SUMMARY JUDGMENT DENIED; REMANDED TO DISTRICT COURT.
*137 VICTORY, J., dissents and assigns reasons.
TRAYLOR and KNOLL, JJ., dissent for reasons assigned by VICTORY, J.
VICTORY, J. (dissenting).
The majority today needlessly reverses a four-three decision rendered by this Court after much deliberation less than two years ago. The decision in Ducote v. Koch Pipeline Co., 98-0942 (La.1/26/99), 730 So.2d 432, was sound when rendered and is sound today, certainly as applied to the facts of this dispute.
We are all in agreement on the general rules of interpretation regarding contracts of insurance. An insurance policy is a contract between two parties and should be construed using the general rules of contract interpretation. Magnon v. Collins, 98-2822 (La.7/7/99), 739 So.2d 191. Courts lack the authority to alter the terms of insurance contracts under the guise of contractual interpretation. When the words of an insurance contract are clear and explicit and lead to no absurd consequences, courts must enforce the contract as written and may make no further interpretation in search on the parties' intent. Peterson v. Schimek, 98-1712 (La.3/2/99), 729 So.2d 1024. An insurer owes a duty to defend the insured unless the claims made against the insured are clearly excluded from coverage in the policy. C.L. Morris, Inc. v. Southern American Ins. Co., 550 So.2d 828 (La.App. 2d Cir.1989).
In applying those principles, however, it is key to note that an insurer's initial decision as to whether the contract between the parties provides coverage for a given claim and/or requires it to defend the insured must be made at the outset of a case by comparing the particular claim or petition filed against the insured with the terms of the insured's policy. It is incumbent on the insurer to make a good faith determination on that issue in a timely fashion and to advise the insured of its determination. When a carrier decides that coverage for a particular claim is not afforded under the contract between the parties, that determination may be litigated by way of a declaratory judgment action or by motion for summary judgment brought by any of the interested parties.
When a coverage issue is presented on motion for summary judgment, the court must take care to restrict its review to the coverage issue at hand and not become unwittingly entangled in the merits of whether the prospective insured is or is not guilty of the conduct asserted against it. In this special type of summary judgement case, the court is to look at the face of the complaint, the facts alleged therein and the insurance contract at issue in reaching a determination as to whether there is a duty to defend and/or cover a claim. Where the petition alleges a claim and facts which, if true, are excluded from coverage, there is no obligation to defend or cover the claim against the insured. Jackson v. Lajaunie, 270 So.2d 859 (La. 1973); Alert Centre, Inc. v. Alarm Protection Services, Inc., 967 F.2d 161 (5th Cir. 1992).
In this case, Genesis filed a motion for summary judgment arguing that it provided no coverage to the Parish of St. Bernard for the claims asserted by the plaintiffs under the terms and conditions of the Commercial General Liability policy issued to the Parish. That policy contained an endorsement known as the "total pollution exclusion"[1] which provided in pertinent part as follows:
This insurance does not apply to:
(1) "Bodily injury", "property damage", "personal injury", or "advertising injury" which would not have occurred in whole or part but for the actual, alleged or threatened discharge, dispersal, *138 seepage, migration, release or escape or pollutants at any time.
Pollutants mean solid liquid, gaseous, or thermal irritant or contaminant including smoke, vapor, soot, fumes, acid, alkalis, chemicals and waste. Waste includes material to be recycled, reconditioned or reclaimed.
An examination of the petition filed against the Parish demonstrates that the conduct claimed by the plaintiffs clearly and unambiguously falls within the ambit of the exclusion in question. There are no genuine issues of material fact in dispute as to the issue properly before us.[2] Accordingly, summary judgment in favor of Genesis was appropriate.
Plaintiffs clearly alleged that they were damaged because the Parish of St. Bernard supplied water to them that was "contaminated by chemicals and other contaminants and materials. ..." They pleaded, among other things, that the Parish negligently allowed waste water from refineries to enter into the Parish water system, then supplied residents with water contaminated by the waste water from those refineries, failed to monitor the intake of water into the Parish water system, failed to keep injurious substances out of the water supply, and thereby created a public health hazard.
It is respectfully suggested that the majority has fallen into error in this case primarily because it has failed to follow the proper methodology for reviewing the special type of summary judgment that presents a coverage issue. It has failed to review the "total pollution exclusion" relied upon by Genesis in the context of the allegations made in the complaint in this case against this insured.
Not a single line of the majority opinion is devoted to an analysis of the factual allegations made by the plaintiffs. Instead, the majority reviews the wording of the "total pollution exclusion" in a vacuum and concludes that the exclusion is ambiguous because it might lead to absurd consequences under some other hypothetical fact scenarios in some other cases. The majority cites Pipefitters Welfare Educ. Fund v. Westchester Fire Inc. Co., 976 F.2d 1037, 1043 (7th Cir.1992) to bolster its conclusion that a literal reading of the pollution exclusion might lead to absurd consequences in cases where a slip and fall might occur from spilled contents of a bottle of Drano or where an allergic reaction to chlorine in a swimming pool might occur. Were this court faced with such a difficult fact scenario, we might well decide that it is appropriate to review the "total pollution exclusion" as it might apply to those facts. But that is not the case before us.[3]
*139 Courts should not decide that exclusions in insurance policies are ambiguous without reference to the allegations in the petition at issue. The decision in Stoney Run Co. v. Prudential-LMI Comm. Ins. Co., 47 F.3d 34 (2d Cir.1995), relied upon by the majority, makes that very point. In litigation involving the inhalation of carbon monoxide fumes from a faulty residential water heater, the court succinctly noted:
"[W]e need only determine whether the clause is ambiguous as applied to the facts of this case. ..." Id. at 38.
It is respectfully suggested that had the majority followed that fundamental rule, it would not have launched into unnecessary "interpretation" of the exclusion at issue, it would not have reversed our decision in Ducote, decided on very different facts, and it would not have rendered what amounts to an advisory opinion essentially rewriting the pollution exclusion and then setting out "fact-intensive" criteria that will make it virtually impossible to determine coverage issues by declaratory judgment or summary judgment at the outset of litigation, when they might properly be handled so that the parties can order their affairs and plan for the conduct or settlement of the litigation.
It should be noted that the majority has not directed us to a single case with a fact scenario even remotely similar to the one presented here in which any other state or federal court has concluded that the "total pollution exclusion" is ambiguous or does not apply on facts like those asserted in this case. Yet we need not look far to find a case similar to the one before us today. In Gregory v. Tenn. Gas Pipeline Co., 948 F.2d 203 (5th Cir.1991), a remarkably similar fact scenario was presented. The City of Natchitoches created and maintained a lake that provided a drinking supply for the City as well as fishing and recreational opportunities. Just as in this case, a neighboring industrial concern, Tennessee Gas Pipeline, discharged chemical contaminants into the lake. And just as in this case, numerous citizens brought suit against the City and its Waterworks District asserting various types of damages. The complaint asserted, inter alia, that the City "knew or should have known of the PCB contamination and was negligent in failing to detect the contamination, to warn plaintiffs of the contamination risks or to clean the lake." Id. at 204. The City had a Commercial General Liability policy with the same kind of pollution exclusion found in the Genesis policy we address in this case.
In Gregory, the Fifth Circuit first correctly noted that under Louisiana law, the pleadings alone determine whether the claims absolve the insurer of the broad duty to defend (as well as the duty to cover the claim). The City argued that the pollution complained of occurred upstream as a consequence of the action of Tennessee Pipeline, a third party. It argued that such pollution originating at another location should not fall within the exclusion. The Fifth Circuit refused to read into the "total pollution exclusion" any requirement that the pollution occur at the hands of the insured or that it originate at the insured's property; there was no such language in the policy. Referring to the City's argument the Fifth Circuit concluded, "This contention is sophistry." Id. at 207.
After carefully and properly considering the allegations of the plaintiffs' complaint with reference to the language of the "total pollution exclusion", Chief Judge Clarke upheld the district courts's summary judgment in favor of the insurer holding:

*140 "Injury and damage arising out of the City's occupancy of the lake comes within the pollution exclusion." Id. at 207.[4]
The Fifth Circuit's decision in Gregory, on facts strikingly similar to those presented here, is representative of the growing weight of authority holding that the "total pollution exclusion" is unambiguous and should be applied as written. Courts are increasingly concluding that the exclusion is clear and enforceable even in the face of some of the difficult fact scenarios discussed by the majority.[5]
Fortunately, we do not deal here with a difficult case requiring creative interpretation. This case involves damages alleged by the plaintiffs to have occurred when an industrial water treatment plant (albeit operated by a governmental entity) took contaminated water out of the Mississippi River and introduced that water, still carrying allegedly hazardous chemical contaminants, into the residential drinking water supply of the Parish of St. Bernard. This is as classic a case of a petition alleging active pollution of an environmental character as any court receiving a declaratory judgment action or summary judgment action on coverage is ever likely to see. Had the majority compared the plain words of the total pollution exclusion to the allegations made by the plaintiffs in this case, rather than launching into an exiguous on hypothetical cases, there would have been no ambiguity found, nor any need to revisit Ducote or any other prior decisions of this court or the appellate courts of this state.[6] Instead, without looking at the allegations of the complaint in this case, the majority *141 determines in the abstract what it considers a "Proper Interpretation of the Total Pollution Exclusion."
The majority essentially rewrites the exclusion and concludes that its application (which it evidently concedes is appropriate in at least some cases) must necessarily turn on three considerations.[7] The first consideration mentioned is whether the insured is a "polluter" within the meaning of the exclusion. It should be noted that there is no language whatsoever in the exclusion that ties its applicability to whether the insured, as opposed to some third party or some condition unknown to the insured (such as a leaking buried tank), is the point of origin of the pollution in question. The majority simply writes that condition into the exclusion on its own. It is difficult to see how any court will be able to determine whether an insured is a "polluter" within the meaning of the exclusion when the exclusion itself does not make that condition a relevant inquiry. However, even if it were a valid consideration, the plaintiffs in this case have clearly so alleged in their petition. The Parish is alleged to have introduced harmful chemical contaminants into the Parish drinking supply.
The second consideration listed by the majority is that the injury-causing substance must be a "pollutant" within the meaning of the exclusion. The exclusion defines a "pollutant" as a contaminant, including chemicals. The plaintiffs' petition uses those exact terms in its allegation that the Parish introduced hazardous substances into the water supply.
The third consideration set forth by the majority is that there has to have been a dispersal of a pollutant within the meaning of the policy. Again, the plaintiffs clearly assert that the Parish dispersed contaminants throughout the Parish drinking water supply. Certainly that is an environmental concern, another factor the majority suggests as determinative. Thus, even under the considerations set forth by the majority, coverage must be excluded when the question is properly framed as to whether the allegations of the petition fall within the language of the exclusion.
Because the majority fails to appreciate the special nature of the type of summary judgment before us, it then embroiders further on the "three" enumerated coverage considerations and suggests that each cannot be determined until there is a fact finding concerning a whole host of issues, many of which may be relevant to ultimate liability, but would have been unknown and unknowable to the parties at the time of entry into the insuring contract.[8] The majority *142 then deviates from the rule of law that coverage and the duty to defend are determined by comparing the terms of the policy to the facts pleaded against the insured and becomes entangled in issues that more properly address the merits of the case. It directs the district court to determine ultimate facts regarding liability, i.e., (1) whether the Parish was a "polluter", (2) whether it introduced "pollutants" into the water system and (3) whether it "dispersed" contaminated water through the system. We need not await such fact findings to determine coverage in this case. It is enough that the plaintiffs in this case have alleged facts that clearly and unambiguously fall within the ambit of the "total pollution exclusion."
Nor can the result reached by the majority today be properly tied to the history of the "total pollution exclusion" or to public policy. The "total pollution exclusion" was not adopted by the insurance industry to further public policy or to make sure that the environment is protected. It was written to narrow the coverage afforded in a CGL policy to protect insurers against catastrophic losses not covered by underwriting. It was written to make sure that insurance carriers would not go bankrupt (with the consequent possible effect on LIGA and like entities in other jurisdictions) and to protect the returns of their stockholders and monies due to other policy holders.
A CGL policy does not necessarily cover all risks that a business may incur, nor do businesses necessarily expect that. Insurance carriers (unless required to do so by a specific state statute) have no obligation to cover all risks within a single policy.[9] In fact, for the good of the consuming public, special types of risks are carved out of general policies, underwritten specially, and offered as specialized coverages for which additional premiums are charged so that the risk of loss for such special risks need not be borne by those who do not need such protection and/or do not choose to purchase it. For instance, workers' compensation coverages are not covered in commercial general liability policies, nor are risks associated with special types of vehicles, or risks associated with professional liability and malpractice. Some businesses may have reason to insure such risks, others may not. Alternatively, they may deem the risk so small as not to warrant spending the money to purchase the coverage. Where negotiated, special manuscript endorsements can be *143 placed in a policy to bring an otherwise excluded risk back into coverage. This is the manner that the industry has chosen to use to deal with pollution risks.
Businesses typically seek the advice of an insurance agent who assists in evaluating the insurance needs of the business so that the proper coverages are purchased in one or more complimentary policies. Such insurance professionals in turn secure professional liability insurance to insure against losses that may be caused because a client fails to buy appropriate coverages when proper advices on insuring the client's needs and coverages available are not given. In the area of insurance provided for municipalities and governmental entities, bids and bid specifications for the insurance desired are generally issued based on the advice of the governmental entities' internal or external insurance consultants. In a business climate especially, insurance carriers are entitled to rely on the businesses with whom they deal to assess their needs and purchase accordingly. In this case, we know that the Parish of St. Bernard had a $250,000 self-insured retention. Moreover, the public telephone directory discloses that it has an "insurance/risk management" office. It can hardly be characterized as an unsophisticated insured.
In sum, the policy language excluding coverage for pollution risks in this case is clear and unambiguous as applied to the facts pleaded by the plaintiffs in this case. A large body of case law exists in other jurisdictions holding that the total pollution exclusion is not ambiguous. We are dealing with an instance of industrial pollution allegedly caused by a Parish which may have been negligent and certainly can be expected to have understood the risk of introducing pollutants into the water system and the potential need for pollution coverage. The fact that its conduct may ultimately be determined to have been negligent rather than intentional is not relevant. Intentional acts are always excluded under general coverage principles. If the Parish was not at fault, it should escape liability altogether on the merits or at least by way of a third-party claim for indemnity. Its relative culpability on the merits, however, has nothing to do with the coverages it did or did not purchase pursuant to the contract of insurance at issue here.
The legislature of this state has recently expressed its will that summary judgment proceedings are designed to secure the just, speedy, and inexpensive determination of actions, that such proceedings are favored, and that they should be construed to accomplish these ends. La.Code Civ. P. art. 966 (amended 1997). The result reached by the majority today effectively rejects that standard and virtually eliminates the prospect of ever resolving coverage cases such as the case at bar by summary judgment. I cannot agree with this result.
Accordingly, I respectfully dissent.
NOTES
[1] Some form of this pollution exclusion is part of the standard CGL policy purchased by almost all large and small businesses since the mid-1980s. See generally 2 Roger Stetter, Louisiana Environmental Handbook § 23:9 (1999).
[2] EPEC Oil was dismissed from this case on May 3, 2000.
[3] During the pendency of the writ application, we permitted the Louisiana Commissioner of Insurance to file an Amicus Curiae brief. Following our grant of the writ in this matter, and while considering the merits of the case, we permitted the Insurance Environmental Litigation Association and Certain Underwriters at Lloyd's London to file Amicus Curiae briefs.
[4] We did grant a rehearing in Ducote only to clarify some procedural aspects of the original opinion. Nothing in the rehearing opinion affected the reasoning within the original opinion. See Ducote v. Koch Pipeline Co., 98-0942 (La.2/26/99), 730 So.2d at 441 (on rehearing) (per curiam).
[5] Other examples include 42 U.S.C. § 3251 et seq. (the Solid Waste Disposal Act) (now replaced by 42 U.S.C. § 6901), 42 U.S.C. § 6901 et seq. (the Resource Conservation and Recovery Act), La.Rev.Stat. 30:2271 et seq. (Louisiana's Mini-Superfund law), and La. Rev.Stat. 30:2001 et seq. (the Louisiana Environmental Quality Act).
[6] Note that the total pollution exclusion in this case is similar to the "absolute" pollution exclusion and is the generally used exclusion today. See 2 Stetter, supra at § 23:9 n. 73.
[7] As noted by the Louisiana Insurance Code, "it is the purpose of all liability policies to give protection and coverage to all insureds, whether they are named insured or additional insureds under the omnibus clause, for any legal liability said insured may have as or for a tort-feasor within the terms and limits of said policy." La.Rev.Stat. 22:655(D).
[8] We note that even stare decisis is not an "inexorable command." See Hohn v. United States, 524 U.S. 236, 251, 118 S.Ct. 1969, 141 L.Ed.2d 242 (1998). Thus, even in a common law jurisdiction, Ducote would be susceptible of being overruled.
[9] As noted by a former Justice of this court, this acceptance of jurisprudence constante is evidenced by the numerous times that this court has reversed itself in the past. See Mack E. Barham, A Renaissance of the Civilian Tradition in Louisiana, 33 La. L.Rev. 357, 373-74 (1973).
[10] The parties have cited many cases from other jurisdictions addressing the proper interpretation of pollution exclusions. As the high courts of other states are generally split on this issue, a review of that jurisprudence is not very persuasive.
[11] As pointed out below, this opinion was ultimately vacated by this court. We recognize that vacated opinions are not binding precedent; however, we refer to Ka-Jon in this context as evidence of the evolution of the treatment of pollution exclusions in Louisiana.
[12] Justice Hall dissented from the majority's decision and assigned reasons that Justice Lemmon adopted as his own. In dissent, both Justice Hall and Justice Lemmon agreed that (1) the pollution exclusion should be read in favor of coverage because it would lead to absurd results if read literally and (2) the exclusion did not apply to nonenvironmental routine accidents merely because they involve discharges of some sort. See id. 93-2926 at 1, 644 So.2d at 367 (Hall, J., dissenting). Each of the Justices disagreed, however, with the majority's distinction regarding environmental damages between fortuitous and intentional acts. See id. (Hall, J., dissenting).
[13] Even if the absolute pollution exclusion was not part of the policy issued to Ka-Jon, in this author's opinion, it was a mistake for this court to vacate its original opinion. If State Farm was correct that the absolute pollution exclusion was not part of the policy in question, our original opinion would not have harmed State Farm in any manner. On remand, State Farm would simply have faced judgment anew without the benefit of the absolute pollution exclusion because of its not being in the policy and irrespective of whether or not this court, in the original opinion, had been correct in accepting the representations of the parties that the policy included the pollution exclusion. At retrial, State Farm would have been able to urge any credible defense available to them but not the exclusion provision which, while the rehearing was pending, they were claiming was not part of the policy. On the other hand, if the trial court later determined that the absolute pollution exclusion was part of the policy, this court would already have ruled on the relevant issue by having earlier found that State Farm could not avoid liability based upon the "absolute pollution exclusion" under the facts of the case.
[14] Federal District Courts in Louisiana have also relied on Ka-Jon as persuasive authority for how these pollution exclusions should be interpreted in this State. See In re: Combustion, Inc., 960 F.Supp. 1076, 1080 (W.D.La. 1997); Bituminous Fire & Marine Ins. Co. v. Fontenot, 907 F.Supp. 193, 196 (M.D.La. 1995).
[15] While Louisiana courts have followed Ducote thus far, the federal courts have not been quite so receptive to its holding. Compare Matheny v. Ludwig, 32,288, p. 7 (La.App. 2 Cir. 9/22/99), 742 So.2d 1029, 1034 (following Ducote) with North Am. Specialty Ins. Co. v. Georgia Gulf Corp., 99 F.Supp.2d 726, 730-31 (M.D.La.2000) (distinguishing Ducote on the grounds that it did not address the applicability of a pollution exclusion when liability is the result of a third party's actions), and First Financial Ins. Co. v. Delta Contracting Enterprises, Inc., No. 99-1830, 1999 WL 1021440 at *1 n. 2, 1999 U.S. Dist. LEXIS 17417, at *4 n. 2 (E.D.La. Nov. 9, 1999) (distinguishing Ducote on the grounds that the damage causing substance in the case may not be a "pollutant" within the meaning of the policy).
[16] While we do not have the benefit of a regulatory record from the Louisiana Department of Insurance in this case, the New Jersey Supreme Court outlined the long history of misleading statements made by insurance companies to state insurance regulators regarding the manner in which pollution exclusions would be applied. See Morton Int'l, Inc. v. General Acc't Ins. Co. of Am., Co., 134 N.J. 1, 629 A.2d 831, 848-55, 868-70 (1993). This was also recognized by the Supreme Court of Texas:

For example, during testimony at a 1985 hearing conducted by the Texas State Board of Insurance, Ward Harrel, a representative of Liberty Mutual Insurance Company, indicated that the pollution exclusion could be read literally to exclude coverage in situations where "no one would read it that way," noting that "our insureds would be at the State Board ... quicker than a New York minute if, in fact, everytime [sic] a bottle of Clorox fell off a shelf at a grocery store and [sic] we denied the claim because it's a pollution loss."
National U. Fire Ins. Co. v. CBI Indus., Inc., 907 S.W.2d 517, 519 n. 3 (Tex.1995).
In fact, the standard explanatory memorandum to regulatory boards on these pollution exclusions stated:
Coverage for pollution or contamination is not provided in most cases under present policies because the damages can be said to be expected or intended and thus are excluded by the definition of occurrence. The above exclusion clarifies this situation so as to avoid any question of intent. Coverage is continued for pollution or contamination caused injuries when the pollution or contamination results from an accident. ...
Nancer Ballard & Peter Manus, Clearing Muddy Waters: Anatomy of the Comprehensive General Liability Pollution Exclusion, 75 Cornell L.Rev. 610, 626 (1990) (quoting Insurance Rating Bd., Submission to Ins. Comm'r of W.Va. (May 18, 1970) and citing Insurance Rating Bd., Submission to Kansas Ins. Dept. (May 18, 1970); Mutual Ins. Rating Bur., Submission to Ins. Dept. of N.Y. (July 29, 1970); Insurance Rating Bd., Submission to Ohio Ins. Dept. (May 8, 1970)). Additionally, we cannot ignore the statements made by the Insurance Ratings Board to the Georgia Insurance Department when the pollution exclusion was considered for approval by that agency:
The impact of the [pollution exclusion clause] on the vast majority of risks would be no change. It is rather a situation of clarification. ... Coverage for expected or intended pollution and contamination is not now present as it is excluded by the definition of occurrence. Coverage for accidental mishaps is continued. ...
New Castle County v. Hartford Acc't and Indem. Co., 933 F.2d 1162, 1198 n. 65 (3rd Cir.1991) (quoting Letter from R. Stanley Smith, Manager of the IRB, to the Georgia Insurance Dept. dated June 10, 1970).
[17] In brief and oral arguments, the parties disputed this issue in particular. Genesis Insurance argued that St. Bernard Parish, by distributing contaminated water to its residents, was a "polluter" of the environment. In contrast, the Parish argues that it is not a "polluter" because it received contaminated water from the Mississippi River, cleaned it, either fully or substantially, and simply passed it on to its users without introducing any new contaminants. This mixed question of law and fact is exactly the kind of issue that a trier of fact is designed, and expected, to resolve.
[18] Our statement supra that St. Bernard Parish took some action in contributing to the pollution event alleged in this case should not be an indication that the Parish discharged, dispersed, seeped, migrated, released, or caused the escape of pollutants within the meaning of the policy. Our statement merely refers to the fact that the Parish may have played some role in the distribution of the allegedly contaminated water. Whether or not this role is sufficient to qualify it as a polluter under the meaning of the insurance policy is a wholly separate issue to be resolved by the trier of fact.
[19] This analysis is similar to the one that the Commissioner of Insurance has directed every insurer to make before denying a claim. See James H. Brown, Louisiana Commissioner of Insurance, Advisory Letter 97-01 (June 4, 1997).
[1] This exclusion or virtually identical variations on it are also sometimes referred to as "absolute pollution exclusions."
[2] Whether plaintiffs' claims are true or not is of no moment at this stage of the proceedings.
[3] A full reading of the Pipefitters case is far more instructive than the single paragraph quoted by the majority. At issue in the case was damage that occurred when 80 gallons of PCB laden liquid was spilled when a container was cut open. The party cutting the container open had received it from another concern (Pipefitters) without warning of its contents. The innocent party was forced to clean up the hazardous spill by the government and sought indemnity from Pipefitters for the damage it sustained. Pipefitters sought a defense and coverage under two separate policies, both of which had "total pollution exclusions." Coverage was afforded under the first policy (Westchester) because the exclusion did not apply under its own terms to "personal injury" and the clean up expenses were found to be a species of "personal injury" arising from a constructive eviction during the clean-up period. However, under the second policy (International), the "total pollution exclusion" did apply to "personal injury." Although the court noted, as does the majority here, that there may well be cases that would not fall under the ordinary understanding of pollution, and even cited some of those difficult cases, it properly continued its analysis to consider the facts asserted in the petition before it and concluded:

There is no need here to determine to what extent, or even whether, we should embrace the limiting principle adopted in the aforementioned cases. ... For regardless of how far the limiting principle extends, it would not exempt the discharge at the Arst site from the reach of the International's pollution exclusion clause.
[S]uit arises from the release of pollutants.... As such, the pollution exclusion bars coverage under the personal injury and property damage provisions of International's policy, and the district court correctly held that International did not owe Pipefitters any duties thereunder. Id. at 1044.
[4] The Fifth Circuit in Gregory was making an Erie guess at what the proper resolution of the case would be under Louisiana law. Its analysis is no less persuasive on that account. Gregory has been widely followed and cited with approval by both federal and state courts.
[5] See particularly the numerous cases deciding that the "total pollution exclusion" and its counterpart "absolute pollution exclusion" are clear and unambiguous digested in the most recent Sept. 2000 pocket part to William B. Johnson, Annotation, Construction and Application of Pollution Exclusion Clause in Liability Insurance Policy, 39 A.L.R.4th 1047 (1985).
[6] It is true that early Louisiana appellate court decisions of this state and our vacated decision in South Central Bell Telephone Co. v. Ka-Jon Food Stores, Inc., 93-2926 (La.5/24/94), 644 So.2d 357, vacated at (La.9/15/94), 644 So.2d 368 seem to indicate that we should engage in an expansive interpretation of the clause at issue. However, a review of those cases will demonstrate first that substantially different fact scenarios were at issue. Moreover, up to and including the time when we addressed Ka-Jon in 1994, our courts had the benefit of relatively little persuasive authority on the "total pollution exclusion" because it had only begun to find its way into policies in the late 1980's so that few cases had become final by that time. Indeed, many of the underpinnings and reasons reflected in the pre Ka-Jon appeal court cases were based on the language of earlier exclusions known as "qualified pollution exclusions" or "standard pollution exclusions," which contained an "exception to the exclusion" if the event complained of was "sudden or accidental". The exception to the exclusion took the claim back into coverage. When the pollution exclusion still contained that exception, litigation focused on what was "sudden or accidental" and whether it was "accidental" from the point of view of the insured. In that context, the quality of the conduct of the insured and the character of the insured were valid inquiries in aid of determining the extent of operation of the exception to the exclusion, and thus whether the exclusion would be applied. However, as a result of the highly subjective nature of those inquiries and resulting decisions, insurance carriers were being required to pay judgments on pollution risks that they did not wish to cover. As a result, the "total pollution exclusion" was introduced that removed the "sudden and accidental" concept and left the exclusion to operate on only two very simple triggersdispersal of a pollutant. Indeed, some of the pre-Ka-Jon appellate cases reached arguably the right result when dealing with difficult issues of whether an event involved a "pollutant" and could have been decided based on a narrow construction of the term "pollutant" without setting up judicially created coverage tests based on intent of the parties and the character of the insured's conduct. This is the more focused approach that is generally being taken elsewhere in state and federal courts now that this body of jurisprudence is maturing.
[7] The majority also seems to suggest that the "total pollution exclusion" should apply only to "active polluters" causing "environmental pollution." However it is clear from the plain language of the exclusion that the only two factors that trigger the operation of the exclusion are that damage be sustained by 1) dispersal of 2) a substance that constitutes a "pollutant." Those two triggers are met in this case. The exclusion contains no language whatsoever that ties its operation to the type of business engaged in by the insured, whether the dispersal was by an "active" polluter, whether the dispersal took place as a result of the conduct of the insured or a third party, where the dispersal occurred, whether it was innocent or culpable, whether the resulting damage was "environmental", etc.... The absence of discussion of these factors in the exclusion does not make it ambiguous. The absence of discussion of these factors is what accounts for the exclusion being a "total pollution exclusion." The insurer and insured agreed by the language of the policy that the insurer will assume no pollution risks. In short, the character or quality of the insured is not one of the factors that triggers the operation of the exclusion. To engraft such factors onto the policy is, in my view, nothing short of rewriting the policy.
[8] For instance, the majority suggests that a coverage determination might turn on a finding as to whether the actions of the insured were active or passive and the amount of the substance discharged. The parties could not possibly have contracted with reference to those factors, which had not yet occurred. Moreover, does the majority suggest that the exclusion would apply differently to active versus passive pollution or that it would apply only to large amounts of pollution? If so, how large? The contract certainly does not contemplate that such factors affect coverage. Under the guise of clarifying, the majority rewrites the exclusion and decides this case in such a way that it is virtually impossible to determine when pollution coverage might apply, notwithstanding an exclusion, until after a court has reviewed an actual occurrence and likely not until after a full blown trial on the merits. Instead of the insured and insurer agreeing that "no" pollution risks are covered (or paid for) when purchasing a CGL policy, coverage may now be afforded under almost any CGL policy based on a litany of factors this Court has devised as well "any other factor the trier of fact deems relevant".
[9] Businesses and insurance companies are free to decide what risks they will accept and cover. And even where insurance coverages are mandated by the state, the carrier always has the choice of withdrawing from an unfriendly market, which has the effect of decreasing competition and driving premiums up further. The insurance business is complex and the players in business insurance can be expected to be sophisticated. The market and the State Insurance Commissioner are in the best position to regulate it. The Commissioner has not chosen to withdraw approval of the "total pollution exclusion." While the Commissioner has indicated that it is not an appropriate exclusion for certain classes of insureds, he has certainly not disapproved the exclusion for municipalities or water treatment facilities. In an effort to provide coverage that this court "thinks" businesses expect, it may well drive the cost of a CGL policy up to the point that many businesses may be forced to either go out of business or go bare of cover. If the "total pollution exclusion" is to be rewritten to afford pollution coverage to businesses that the majority "thinks" expect it, that endeavor is better commended to the legislature or the Office of the Commissioner of Insurance, both of which bodies have access to expertise in the writing of insurance provisions, which is clearly not the province of this court.