807 So.2d 1010 (2002)
Joseph SMITH, et al.
v.
RELIANCE INSURANCE CO. OF ILLINOIS, South Louisiana Port Commission, et al.
Nos. 01-CA-888, 01-CA-889 to 01-CA-898, 01-387.
Court of Appeal of Louisiana, Fifth Circuit.
January 15, 2002.
*1013 Robert S. Abdalian, Metairie, LA, Counsel for Plaintiffs and Interim Plaintiff's Liaison.
James R. Sutterfield, Gordon P. Serou, Jr., New Orleans, LA, Counsel for Reliance Insurance Company of Illinois, Defendant-Appellant.
S. Gene Fendler, Robert E. Holden, G.C. Slawson, Jr., Michael A. Golemi, Liskow & Lewis, New Orleans, LA, Joel T. Chaisson, Destrehan, LA, Counsel for South Louisiana Port Commission, Defendant-Appellee.
James R. Carter, John A. Womble, Porteous, Hainkel, Johnson & Sarpy, New Orleans, LA, Counsel for Alvarez Donnaway Passons, Inc., Third Party Defendant-Appellee.
Panel composed of Judges THOMAS F. DALEY, MARION F. EDWARDS and WALTER J. ROTHSCHILD.
WALTER J. ROTHSCHILD, Judge.
In these consolidated appeals, defendant Reliance Insurance Company of Illinois seeks review of a partial summary judgment rendered in favor of the Port of South Louisiana. The primary issue presented for our review is whether Reliance has a duty to defend the Port for allegations made by plaintiffs in this case. For the reasons more fully stated herein, we affirm the judgment of the trial court requiring Reliance to provide a defense to the Port.

FACTUAL AND PROCEDURAL HISTORY
According to the allegations of plaintiffs' petitions, the South Louisiana Port Commission, operating as the Port of South Louisiana, owns and operates waste water treatment impoundments located at its Globalplex facility in Reserve, Louisiana. In April of 1999, high amounts of sugar in the waste water and the failure of a mechanical aerating pump caused one of the ponds at the facility to overload. The overload made the pond anaerobic or septic, resulting in the release of substances, including hydrogen sulfide. The release of these substances caused noxious odors which the wind carried to the location of plaintiffs' homes and property, causing the alleged damages. The odors began on or about April 17, 1999.
As a result of this incident, eleven suits for personal injury on behalf of over five thousand named plaintiffs, have been filed against the Port. The first suit on behalf of Joseph Smith, et al was filed on June 16, 1999, and the following ten lawsuits asserted similar allegations. Plaintiffs subsequently filed supplemental and amending petitions to include as defendants Delta Beverage Group, Inc. and others on the basis that these companies contracted with the Port for the treatment of waste water. All of the suits were consolidated in the trial court, and eight of the lawsuits seek to be certified as class actions.
On October 29, 1999, the Port filed a third party demand against Reliance seeking a defense of plaintiffs' allegations under a policy of insurance issued by Reliance to the Port. Reliance answered this demand and moved for summary judgment, contending that there is no coverage *1014 for plaintiffs' claims under the policy, and there is thus no duty to defend.
In response, the Port filed a cross-motion for partial summary judgment, seeking a declaration that Reliance owed it a defense. Further, the Port moved that Reliance be ordered to pay its defense costs incurred to date and all costs of defense until the conclusion of the litigation.
Both motions for summary judgment were heard by the trial court on February 12, 2001. On that date, the trial court granted the Port's motion for partial summary judgment and denied the motion of Reliance, assigning oral reasons therefor. The trial court initially rendered an order to this effect on March 5, 2001.[1] Reliance moved for a new trial, which was denied, and the trial court rendered a final partial judgment against Reliance on April 16, 2001. Reliance now appeals from this judgment on the basis of numerous assignments of error.

APPLICABLE LAW
Summary judgment shall be rendered if there is no genuine issue as to material fact and the mover is entitled to judgment as a matter of law. La. C.C.P. art. 966(B). The burden of proof on a motion for summary judgment is on the movant to establish that no material factual issues exist. La. C.C.P. art. 966(C)(2); Schroeder v. Board of Supervisors of La. State Univ., 591 So.2d 342, 345 (La.1991). Only when reasonable minds must inevitably conclude that the mover is entitled to judgment as a matter of law on the facts before the court is a summary judgment warranted. Chaisson v. Domingue, 372 So.2d 1225, 1227 (La.1979). Summary judgment declaring a lack of coverage under an insurance policy may not be rendered unless there is no reasonable interpretation of the policy, when applied to the undisputed material facts shown by the evidence supporting the motion, under which coverage could be afforded. Westerfield v. LaFleur, 493 So.2d 600, 605 (La.1986). An insurer seeking to avoid coverage through summary judgment must prove that some exclusion applies to preclude coverage. Jackson v. Frisard, 96-0547 (La.App. 1st Cir.12/20/96), 685 So.2d 622, 629, writs denied, 97-0193 and 97-0201 (La.3/14/97), 689 So.2d 1386 and 1387. Appellate review of summary judgment is de novo, utilizing the same criteria that guide the trial court's grant of the judgment. Guillory v. Interstate Gas Station, 94-1767 (La.3/30/95), 653 So.2d 1152.
The resolution of this case turns on the provisions and exclusions contained in the subject insurance policy. A succinct statement of the law pertaining to insurance agreements has been recently set forth by the Supreme Court in Doerr v. Mobil Oil Corp., 00-0947 (La.12/19/00), 774 So.2d 119, 124:
An insurance policy is an aleatory contract subject to the same basic interpretive rules as any other contract. See La. Civ.Code art.1912, cmt. e; Magnon v. Collins, 98-2822 (La.7/7/99), 739 So.2d 191, 196; Peterson v. Schimek, 98-1712 (La.3/2/99), 729 So.2d 1024, 1028; Smith v. Matthews, 611 So.2d 1377, 1379 (La. 1993). The interpretation of an insurance contract is nothing more than a determination of the common intent of the parties. See La. Civ.Code art.2045; Magnon, 98-2822, 739 So.2d at 196; *1015 Ledbetter v. Concord Gen. Corp., 95-0809 (La.1/6/96), 665 So.2d 1166, 1169. Obviously, the initial determination of the parties' intent is found in the insurance policy itself. See La. Civ.Code art. 2046. In analyzing a policy provision, the words, often being terms of art, must be given their technical meaning. See id. at art.2047. When those technical words are unambiguous and the parties' intent is clear, the insurance contract will be enforced as written. See La. Civ.Code art.2046; Magnon, 739 So.2d at 197. If, on the other hand, the contract cannot be construed simply, based on its language, because of an ambiguity, the court may look to extrinsic evidence to determine the parties' intent. See Peterson, 729 So.2d at 1029.
When determining whether or not a policy affords coverage for an incident, it is the burden of the insured to prove the incident falls within the policy's terms. See Barber v. Best, 394 So.2d 779, 781 (La.App. 4th Cir.1981). On the other hand, the insurer bears the burden of proving the applicability of an exclusionary clause within a policy. See Dubois v. Parish Gov't Risk Mgmt. Agency Group Health, 95-546 (La.App. 3 Cir. 1/24/96), 670 So.2d 258, 260; Shaw v. Fidelity & Cas. Ins. Co., 582 So.2d 919, 925 (La.App. 2nd Cir.1991); Landry v. Louisiana Hosp. Serv., Inc., 449 So.2d 584, 586 (La.App. 1st Cir.1984); Barber, 394 So.2d at 781. Importantly, when making this determination, any ambiguities within the policy must be construed in favor of the insured to effect, not deny, coverage. See Yount v. Maisano, 627 So.2d 148, 151 (La.1993); Garcia v. St. Bernard Parish Sch. Bd., 576 So.2d 975, 976 (La.1991); Breland v. Schilling, 550 So.2d 609, 610 (La.1989); Sherwood v. Stein, 261 La. 358, 362, 259 So.2d 876, 878 (1972).
Moreover, it is well settled law that the insurer's obligation to defend suits against its insured is generally broader than its liability for damage claims. Steptore v. Masco Const. Co., 93-2064 (La.8/18/94), 643 So.2d 1213. This duty to defend is determined by the allegations of the plaintiff's petition, with the insurer being obligated to furnish a defense unless the petition unambiguously excludes coverage. Id. Thus, assuming all the facts of the petition to be true, if there would be coverage under the policy and liability to the plaintiff, the insurer must defend the insured regardless of the outcome of the suit or the eventual determination of actual coverage. The allegations of the petition are liberally interpreted in determining whether they set forth grounds which bring the claims within the scope of the insurer's duty to defend the suit brought against its insured. Yount v. Maisano, 627 So.2d 148 (La.1993).
With these guiding principles in mind, we proceed to the interpretation of the insurance policy at issue. Our immediate task is to compare the allegations of plaintiffs' petitions with the terms of the policy to determine whether the claims fall within the scope of the insurer's duty to defend.

The allegations of plaintiffs' petitions
The specific allegations of plaintiffs' petitions include the following facts:
Plaintiffs allege that as a result of the noxious odors from defendant's facility, they and others in the vicinity sustained damages including, but not limited to, personal injury, mental and economic damages and/or inconvenience. Specifically, plaintiffs allege they suffered from ailments including but not limited to respiratory and eye problems, headaches, nausea, sleeplessness, diarrhea and rashes. Further, plaintiffs allege they underwent "great inconvenience as a result of the fault of defendant including, but not limited to being confined inside their homes, having to leave their homes, interference *1016 with school and work and interference with recreational activities." They also assert that they suffered damages in the form of mental anguish, emotional distress, justifiable fear and fright, inconvenience, and loss of the use and enjoyment of their homes and property. Plaintiffs further contend that they are harmed in their persons and property from the increased presence of mosquitoes which were exacerbated by the operations of defendant's facility.

The insurance policy
The insurance policy at issue in this case is a marine commercial general liability policy issued by Reliance Insurance Company of Illinois to the Port that was effective from January 1, 1999 to January 1, 2000. Under the terms of the policy, Reliance provided primary coverage for $1,000,000 of liability per occurrence, $3,000,000 aggregate, for bodily injury or property damage caused by the Port. Additionally, the policy contained several exclusionary clauses which Reliance argues are applicable to this case and a limited pollution buy-back endorsement on which the Port relies to confer coverage under the policy. The policy also requires Reliance to defend the Port with respect to any "suit" that alleges any covered "occurrence." The pertinent coverage provisions of the policy provide as follows:
Section 1Coverage
Coverage A. Bodily Injury and Property Damage Liability Insuring Agreement
1. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend any "suit" seeking those damages.
* * *
Coverage BPersonal Injury and Advertising Injury Liability Insuring Agreement
1. We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal injury" or "advertising injury" to which this coverage part applies. We will have the right and duty to defend any "suit" seeking those damages.

The exclusions
Reliance contends that coverage for the bodily injury, property damage and personal injury asserted by plaintiffs is excluded by the following policy provisions: Section IIExclusions
Notwithstanding anything to the contrary contained in this policy, it is hereby understood and agreed that this policy is subject to the following exclusions and that this policy shall not apply to:
* * *
10.a. "Bodily injury" or "property damage" which would not have occurred in whole or part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time.
* * *
This exclusion applies regardless of whether the "pollution" itself or the "bodily injury" and/or "property damage" caused by the pollution was fortuitous, accidental and/or intentional and regardless of whether the "pollution" caused environmental damage.
In the definition section of the policy, "pollutants" means "any solid, liquid, gaseous or thermal irritant or contaminant including smoke, vapor, soot, fumes, acid, alkalis, chemicals and waste *1017 regardless of where found. Waste includes, but is not limited to, material to be recycled, reconditioned or reclaimed."
"Pollution" means "the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of `pollutants', whether accidental, fortuitous or intentional and whether or not damaging to the environment."
The policy also contains a "Limited Pollution Buy-Back (72 Hour) Endorsement" which provides in pertinent part:
In consideration of the additional premium shown in the schedule to this endorsement and subject to the terms and conditions of the policy, it is agreed that:
1. Exclusion 10 of Section II. A. shall be voided, but only to the extent of the coverages provided under this endorsement and provided that you establish that all of the following conditions have been met:
a. The discharge, dispersal, release or escape was neither expected nor intended by the Insured. A discharge, dispersal, release or escape shall not be considered unintended or unexpected unless caused by some intervening event neither expected nor intended by the Insured.
b. The discharge, dispersal, release or escape can be identified as commencing at a specific time and date during the term of this policy.
c. The discharge, dispersal, release or escape became known to the Insured within 72 hours after its commencement and was reported to Underwriters within Thirty (30) days thereafter.
d. The discharge, dispersal, release or escape did not result from the Insured's intentional and willful violation of any government statute, rule or regulation.
* * *
3. Nothing contained in this endorsement shall operate to provide any coverage hereon for liability, expense or costs, whether incurred fortuitously, accidently and/or intentionally and whether or not environmental in nature, with respect to:
* * *
d. Any site or location used in whole or in part for the handling, processing, treatment, storage, disposal or dumping of any waste materials or substance or the transportation of any waste materials or substances.
* * *
Reliance also relies on Exclusion 11 which provides:
11. "Bodily injury" and/or "personal injury" or loss of, damage to, or loss of use of property, whether fortuitous, accidental and/or intentional and whether or not damaging to the environment, directly or indirectly arising from or caused in whole or in part by:
a. Waste or disposal sites which were, or currently are owned, operated, or used by you or were or currently are utilized by others acting for and/or on your behalf;
b. Disposal, dumping, conveyancing, carriage, or transportation of any "pollutants"; and
c. Evaluating and/or monitoring and/or controlling and/or removing and/or nullifying and/or cleaning up "pollutants."
On June 23, 1999, approximately two months after this incident, the Port secured Amendatory Endorsement No. 3, which had a retroactive effective date of *1018 January 1, 1999. That endorsement provides as follows:
In consideration of the additional premium shown in the schedule to this endorsement and subject to terms and conditions of the policy, effective January 1, 1999, Marine Comprehensive Policy (MCL 0295100), Section II.A., Exclusion 11 applies only with respect to "bodily injury" and/or "personal injury" or loss of, damage to, or loss of use of property which arises or is alleged to have arisen directly or indirectly from or caused in whole or in part by "pollutants."
Additionally, Reliance relies on exclusions 16 and 26 which provide:
16. Any "liability, expense or costs (including but not limited to investigation, testing, clean-up or removal) for claims or `suits' or proceedings for `bodily injury' or `property damage', or `personal injury' or `advertising injury' which directly or indirectly arise out of the inhalation of, or ingestion of, or absorption of, or any singular or continuous or intermittent exposure to any substance, gases, materials, products, wastes or emissions, noise or any environmental disturbance for which you might be liable."
26. "Property damage" to "impaired property" or property that has not been physically injured, arising out of:
a. A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work;" or
b. A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.
This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

The ruling of the trial court
The trial court, in its oral reasons for judgment, determined that each of these referenced exclusions were pollution exclusion clauses which were subject to the terms and conditions of the buy-back endorsement. The court further determined that paragraph 3(d)of the endorsement applies to property damage only, and the insurer may be responsible for any odors that may have been discharged from the plant, provided that paragraph 1, a-d, have been met. The court further determined that Reliance failed to show that it was prejudiced by the failure of the insured to give notice of the incident within 30 days as specified by paragraph 1(C) of the endorsement. Thus, the trial court granted the Port's motion for summary judgment holding that Reliance had a duty to defend its insured on the allegations raised in plaintiffs' petitions.

DISCUSSION
As the mover in the summary judgment, the Port has the burden to establish the absence of material issues of fact as to the possibility of coverage under the subject policy. La. C.C.P. art. 966(C)(2). However, the insurer bears the burden of proving one of the exclusions applies in order to negate coverage and a duty to defend.
Reliance first argues that coverage under the policy based on plaintiffs' allegations of fact is unambiguously excluded by exclusion 10 of the policy. The substance of exclusion 10, which is also referred to as a total pollution exclusion, has been extensively litigated in Louisiana courts. At the time Reliance filed its motion for summary judgment in the trial court seeking to avoid coverage under the policy, Reliance relied on the Supreme *1019 Court case of Ducote v. Koch Pipeline Co., 98-0942 (La.1/20/99), 730 So.2d 432, which held that a pollution exclusion similar to the one in the Reliance policy was unambiguous and precluded coverage for plaintiffs' petition for damages based on the release of anhydrous ammonia caused by the insured.
However, the holding in Ducote was subsequently overruled by the Supreme Court. The most recent pronouncement on the total pollution exclusion by the Louisiana Supreme Court is the case of Doerr v. Mobil Oil Corp., 00-0947 (La.12/19/00), 774 So.2d 119, 124. The court in Doerr held that an exclusion in the subject policy which was similar to exclusion 10 in Reliance's policy was not intended to be read strictly to exclude coverage for all interactions with irritants or contaminants at any time.[2] The court found that the exclusion was ambiguous as it led to absurd consequences. The court in Doerr further found that the general purpose of the pollution exclusion clause is to exclude coverage for environmental pollution. Id., 774 So.2d at 119.
According to the court's holding in Doerr, the applicability of a total pollution exclusion in any given case must necessarily turn on several considerations:
(1) Whether the insured is a "polluter" within the meaning of the exclusion;
(2) Whether the injury-causing substance is a "pollutant" within the meaning of the exclusion; and
(3) Whether there was a "discharge, dispersal, seepage, migration, release or escape" of a pollutant by the insured within the meaning of the policy.
First, the determination of whether an insured is a "polluter" is a fact-based conclusion that should encompass consideration of a wide variety of factors. In making this determination, the trier of fact should consider the nature of the insured's business, whether that type of business presents a risk of pollution, whether the insured has a separate policy covering the disputed claim, whether the insured should have known from a read [sic] of the exclusion that a separate policy covering pollution damages would be necessary for the insured's business, who the insurer typically insures, any other claims made under the policy, and any other factor the trier of fact deems relevant to this conclusion. Second, the determination of whether the injury-causing substance is a "pollutant" is also a fact-based conclusion that should encompass a wide variety of factors..... Consequently, when making this determination, the trier of fact should consider the nature of the injury-causing substance, its typical usage, the quantity of the discharge, whether the substance was being used for its intended purpose when the injury took place, whether the substance is one that would be viewed as a pollutant as the term is generally understood, and any other factor the trier of fact deems relevant to that conclusion.
Finally, the determination of whether there was "discharge, dispersal, seepage, migration, release or escape" is likewise a fact-based conclusion that must result after a consideration of all relevant circumstances. Specifically, the trier of fact should consider whether the pollutant was intentionally or negligently discharged, the amount of the injury-causing substance discharged, whether the actions of the alleged polluter were active *1020 or passive, and any other factor the trier of fact deems relevant. These factual conclusions should be made to assist a court in determining whether the total pollution exclusion in any particular case will exclude coverage for a claim. [footnotes omitted]
On appeal, Reliance argues that the facts of this case meet all of the requirements set forth in the Doerr case, and that based on the facts alleged by plaintiffs, coverage under the policy is excluded by exclusion 10. However, the record fails to support the application of the factors enunciated by Doerr to the facts of this case. Accordingly, in light of the recent pronouncement by the Supreme Court in Doerr and after consideration of the above-mentioned factors, we conclude that the insurer in this case failed to meet its burden of proving the applicability of Exclusion 10 of the policy, the total pollution exclusion.
Additionally, although the parties extensively dispute the applicability of the limited buy-back endorsement to this exclusion, we find it unnecessary to reach this issue based on our holding that Exclusion 10 does not unambiguously exclude coverage based on the facts alleged in this case.
Reliance next contends that the policy excludes coverage based on the provisions of Exclusion 11 which applies to waste or disposal sites. Reliance points to the fact that plaintiffs' petitions alleged that the incident causing their damages arose out of a waste water treatment facility and argues that Exclusion 11 is therefore applicable. However, the terms of the exclusion regarding waste or disposal sites do not unambiguously apply to the waste water treatment facility alleged in plaintiffs' petitions. There are no allegations in plaintiffs' petitions that the Globalplex facility is a waste or disposal site as stated in the policy. Further, the exclusion clause does not include a definition of the term "waste." Waste is generally referred to in the policy's definition of pollutants as "material to be recycled, reconditioned or reclaimed."
However, the policy also specifically defines "waste" within Exclusion 17, which provides in part as follows:
As used in this policy:
* * *
"Waste" means any waste material (a) containing "by-product material" other than the tailing or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its "source material" content, and (b) resulting from the operation by any person or organization of any "nuclear facility" included under the first two paragraphs of the definition of "nuclear facility."
(Emphasis added.)
There is no indication in the present case that any of the substances which were alleged to have been emitted from the Globalplex facility fit within this definition of waste. Reliance disputes the application of the above-cited definition to the term waste used in Exclusion 11 and elsewhere throughout the policy. However, there is nothing in Exclusion 17 which limits the definition of waste to that section of the policy, and in fact the definition is preceded by the phrase "as used in the policy." Although Reliance relies on a statement in the preamble to the policy that words in quotation marks have special meaning, we nevertheless find that the definition of the term "waste" in the policy as nuclear waste causes the meaning of terms of exclusion 11 to be ambiguous.
When a policy of insurance contains a definition of any word or phrase, its definition is controlling. Zanca v. Breaux, 590 So.2d 821, 824 (La.App. 4th Cir.1991). Further, when a provision is *1021 susceptible to more than one reasonable interpretation, it is ambiguous and must be construed in favor of coverage. McCarthy v. Berman, 95-1456 (La.2/28/96), 668 So.2d 721, 726. Under the circumstances of this case, use of the term waste in exclusion 11 is ambiguous, and the insurer failed to meet its burden to prove that this exclusion unambiguously excludes coverage to its insured for plaintiffs' allegations.
We turn next to exclusions 16 and 26 which are relied upon by the insurer in denying coverage. Exclusion 16 is a health hazard exclusion which applies to "any liability ... for claims.. which directly or indirectly arise out of the inhalation of, ingestion of, or absorption of, or any singular or continuous or intermittent exposure to any substance, gases, materials, products, wastes or emissions, noise or any environmental disturbance for which you might be liable." Our review of this exclusion and the allegations of plaintiffs' petitions fails to prove that all the allegations asserted are unambiguously excluded by these provisions. Specifically, the provisions of Exclusion 16 do not unambiguously exclude coverage for plaintiffs' alleged inconvenience and avoidance of the odors or for their alleged loss of joie de vivre. Further, plaintiffs allege that they were harmed by the increased presence of vectors, primarily mosquitoes, in the area due to this incident. Exclusion 16 does not unambiguously exclude coverage for these allegations of damages.
With regard to Exclusion 26 relied upon by Reliance, the provisions of that exclusion apply solely to property damage claims, and the provisions do not exclude coverage for the remaining claims of personal injury alleged by plaintiffs. Further, all of the allegations of property damage in plaintiffs' petitions are not based on alleged negligence or defective conditions of the insured's product. Finally, the exclusion specifically excepts "loss of use of other property arising out of sudden and accidental physical injury to `your product' or `your work' after it has been put to its intended use."
We have carefully examined the entire record in this case, including plaintiffs' petitions, the insurance policy at issue and the pleadings and arguments of the parties. Our review of the specific provisions of the Reliance policy and the applicable jurisprudence convinces us that Reliance's policy exclusions are either ambiguous or inapplicable when construed according to the allegations of plaintiffs' petitions. Additionally, we conclude that some allegations of damages claimed by plaintiffs are not unambiguously excluded by the Reliance policy. Because these exclusions do not preclude every possibility of coverage, Reliance owes a defense to its insured. An insurer is obligated to defend if the complaint discloses even a possibility of liability under the policy. Jensen v. Snellings, 841 F.2d 600, 612 (5th Cir.1988).
Accordingly, we find that the Port met its burden of proof on its motion for summary judgment that the policy as a whole does not unambiguously exclude coverage in light of the allegations contained in the pleadings. Thus, we hold that Reliance has a duty to provide a defense to the Port for the underlying litigation. The trial court did not err in rendering summary judgment in this case.
In its final assignments of error, Reliance contends that the trial court erred in ordering the insurer to pay for all costs of defense incurred by the Port to date and to cover all future costs of defense. Reliance contends that there was no proof submitted to the trial court with regard to the actual costs of defense to date. Reliance further contends that the Port is not entitled to select its own counsel as an insurer may discharge its duty to defend by appointing counsel of its *1022 own choosing, citing Dugas Pest Control of Baton Rouge, Inc. v. Mutual Fire, Marine and Inland Insurance Company, 504 So.2d 1051, 1054 (La.App. 1st Cir.1987) and Vargas v. Daniell Battery Mfg. Co., 93-2282 (La.App. 4th Cir.2/2/95), 648 So.2d 1103, 1006.
Louisiana law is well settled that an insurer's failure to defend the insured on plaintiffs' allegations renders the insured liable for attorney's fees incurred by the insured in defense of a negligence action. Steptore v. Masco Const. Co., Inc., 93-2064 (La.8/18/94), 643 So.2d 1213, 1218. However, Reliance contends that although a duty to defend may be owed, Reliance is entitled to choose counsel for its insured.
In the recent decision of Belanger v. Gabriel Chems, Inc., 00-0747 (La.App. 1st Cir.5/23/01), 787 So.2d 559, 563 cited by appellee, the court found that when the insurer denies coverage, there is a conflict of interest between the insured and the insurer. Further, the court found that the denial of coverage by the insurer is an event which entitles the insured to select independent counsel to represent them at the insurer's expense. Id. at 566. In reaching this conclusion, the court relied on Corpus Juris Secundum, 46 C.J.S. 1157, and held that the insurance company must underwrite the reasonable costs incurred by an insured in defending an action with counsel of its own choosing.
We agree with the reasoning set forth in the Belanger case. In the present case, Reliance vigorously albeit unsuccessfully denied coverage in an effort to avoid providing a defense to the Port. The plaintiffs' allegations and Reliance's claim of coverage exclusions create a conflict of interest between the insurer and its insured which entitles the insured to assume control of the defense of the tort action and to select its own counsel. Reliance must underwrite reasonable costs incurred by the insured.
Accordingly, we find no error of the trial court in ruling that Reliance shall pay the Port's costs of defense to date and all future costs of defense. Although the trial court has not yet determined the amount of such costs, the law supports a reasonable payment of costs incurred by the insured where coverage is denied.

CONCLUSION
Based on the foregoing, we affirm the judgment of the trial court signed on April 16, 2001 in favor of the Port of South Louisiana. We likewise affirm the judgment ordering Reliance to indemnify the Port for all expenses and costs of defense to date arising from this action, as well as all costs of defense until conclusion of the litigation. All costs of this appeal are assessed to Reliance Insurance Company of Illinois.
AFFIRMED.
DALEY, J., Concurs With Reasons:
I concur with the result reached by the majority, but find that the presence of the Limited Pollution Buy Back Endorsement creates the possibility of coverage and, therefore, the requirement that Reliance provided a defense to the South Louisiana Port Commission.
The majority opinion affirms the trial court's decision relying on the recent Louisiana Supreme Court case of Doerr v. Mobil Oil Corp., 00-0947 (La.12/19/00), 774 So.2d 199. The trial judge in this case also considered the Doerr opinion as evidenced by his oral reasons. The trial judge, relying on the reasoning in Doerr, stated that insurance policies are to be interpreted according to the agreement between the parties. The trial judge specifically found that, "Exclusion number 10 of the M.C.L. § policy is not subject to ambiguity." What created ambiguity in this case was the language of the Pollution Buy Back *1023 Endorsement and how that language related to the entire insurance contract. I agree with the trial judge.
The policy contains a Limited Pollution Buy-Back (72-hour) Endorsement that "voids" the pollution exclusion (Exclusion 10) provided the Port meets four specific conditions. Reliance argues that these conditions were not met, and further argues that even if they were, coverage is excluded under three other exclusions (11, 16, and 26). The Port argues that it paid additional premiums for the Buy Back, and if its coverage is excluded by three other exclusions, this renders the buy back coverage "illusory" and is contrary to law, and the policy should be interpreted to provide coverage for this event. The purpose of a limited buy back endorsement is to allow the insured, in consideration of an additional premium, to buy back coverage for an otherwise excluded incident, provided the endorsement's conditions are met. Under the terms of Exclusion Number 10, pollution coverage was to be excluded. The Buy Back Agreement voided the pollution exclusion under certain conditions. The trial court correctly concluded you can't buy something back only to have it excluded by some other exclusionary language.
After reviewing the language of the Limited Pollution Buy Back Endorsement, the trial judge held that Reliance would not be responsible for any property damage on any site or location, but could be responsible for odors that might have been discharged from the plant, provided that the requirements of 1-A through D of the Buy Back Endorsement have been met. The trial judge then went on to note that the parties disputed whether or not the notice provisions of condition C had been met.
The parties spent much time arguing in brief whether the Buy Back Endorsement's conditions on notice were met, and thus whether the Buy Back Endorsement was triggered. Specifically, the parties have conceded that Reliance was not notified within the time period required in the Buy Back Endorsement. Reliance offers several federal court cases interpreting similar Pollution Buy Back Endorsements where the notice requirements were strictly construed. See Matador Petroleum v. St. Paul Surplus Lines, 174 F.3d 653 (5th Cir.1999), Jenkins v. Lawrence, 2000 WL 1751613, 2000 U.S. Dist. Lexis 17544 (E.D.La.11/28/00); Clarendon Am. Ins. Co. v. Bay, Inc., H-97-2234 (S.D.Tex.6/1/98), 10 F.Supp.2d 736.
The Port counters that Louisiana takes the "minority" view that notice requirements in insurance policies are simply to prevent the insurer from being prejudiced, not to provide a technical escape hatch by which to deny coverage in the absence of prejudice (or bad faith, fraud, or collusion) nor to evade the fundamental protective purpose of the insurance contract, citing Miller v. Marcantel, 221 So.2d 557 (La.App. 3 Cir.1969).
This unresolved question of law, whether to strictly apply the notice requirements of a Limited Buy Back Endorsement, is an issue upon which the trial court has not yet ruled. This open question of law creates a situation that, at this point, does not clearly exclude coverage for this incident, and, therefore, a duty is imposed upon Reliance to provide a defense to the Port.
Reliance further argues that even if the Buy Back Endorsement has been triggered, coverage for this incident is excluded under the additional three exclusions. The Port argues that Reliance's interpretation of the policy renders the Buy Back Endorsement's coverage illusory, which is contrary to the law. I find, as did the trial judge, that the presence of the Buy Back Endorsement to Exclusion 10 created a contract of insurance for some pollution *1024 coverage, which, given the pleadings in this case, created a duty to defend.
NOTES
[1] Reliance initially filed an application for supervisory review from the partial summary judgment rendered on March 5, 2001. However, the trial court subsequently certified the judgment as final on April 16, 2001, and Reliance perfected these appeals. By order of this Court dated September 27, 2001, the writ application filed by Reliance, No. 01-C-387, was consolidated with the appeals pending on the same issues.
[2] The exclusion addressed in the Doerr case provided in pertinent part as follows:

"Bodily injury", "property damage", "personal injury" or "advertising injury" which would not have occurred in whole or in part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of pollutants at any time.